# GEO. STEPHENS v. M. V. B. GIFFORD ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF ERIE COUNTY.

Argued April 29, 1890—Decided October 13, 1890.

[To be reported.]

1. While, as a general rule, the transfer of property, on the sale of a chattel, is effected by the transfer of the chattel itself to the possession

Statement of Facts.

of the purchaser, yet the parties may modify it within certain limits, by their contracts, and may make such terms and conditions as are convenient to them.

2. But, when such terms and conditions are prejudicial to others and, by giving to the vendor a deceptive appearance of ownership and a false credit, are calculated to mislead the public, they will be held to be void as to those who must otherwise be injuriously affected by them.

3. When, therefore, the owner of goods sells them to A, without delivery of possession, and afterwards sells them to B, an innocent purchaser, who takes possession, the title of A is gone, and it is of no consequence that A acted in good faith and paid a fair price, and that his reasons for not taking possession arose from his confidence in the vendor.

4. When the vendor is in possession at the time of the sale, the want of a change of possession is not merely evidence of fraud, but such a circumstance, per se, as makes the transaction fraudulent as to creditors and subsequent bona fide purchasers, the law imputing fraud to the first purchaser because of his neglect to take possession.

5. In determining what is a sufficient taking of possession to protect the purchaser, the nature of the property, and the relation of the parties to it and to each other, must be considered; and the possession taken must be such as is usual in such cases, and consistent with the situation of the goods in connection with the business for which they are held.

6. When the purchaser of a team of horses, etc., arranged with the vendor for the use of the stable until he should be ready to move them, and with the keeper, having the key of the stable, to continue in the care of them, but with no change in the visible possession of the team, the sale was fraudulent as to an execution creditor of the vendor.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 276 January Term, 1890, Sup. Ct.; court below, No. 170 November Term 1888, C. P.

On November 12, 1888, an appeal was entered by the defendants from the judgment of the recorder of Erie city in favor of George Stephens against M. V. B. Gifford and Frank Williams, for $550 and costs. The plaintiff having filed a statement of claim in trespass for the value of a pair of horses, wagon and harness, sold as the property of Frank Mulkie, by Gifford as sheriff, on an execution in favor of Williams, the defendants pleaded not guilty.

At the trial on December 11, 1889, the plaintiff's evidence was to the effect that in the latter part of May, 1888, the plaintiff, who lived at Titusville and conducted a cooper-shop, had an account of about $3,000 against Frank Mulkie, who

Charge of Court below.

carried on an oil refinery at Corry. Meeting Mulkie at Corry, Mulkie proposed to sell to plaintiff the horses, wagon and harness in dispute for $550, the plaintiff to have the use of the barn where the horses were kept, while they remained at Corry, with the feed that was on hands. The plaintiff told Mulkie he would write and let him know as to the proposition. The same day, the plaintiff met John Keefer, who for a long time had had the care of the team for Mulkie, and arranged with Keefer that if he bought the property Keefer should take charge of it for him. On May 29th, the plaintiff accepted Mulkie's offer by letter, and the same day Mulkie discharged Keefer from his employ, and Keefer after that charged his time to the plaintiff. Mulkie the same day, charged the price of the team to the plaintiff. Keefer continued to keep the horses, etc., in the same compartment of the same barn where they were kept before, the barn being inclosed within the refinery property. He carried the keys of the compartment as before, and he alone had access to it. On June 2d, a writ of execution came into the hands of Sheriff Gifford, at the suit of Frank Williams against Frank Mulkie, and on June 5th, a levy was made upon the property in dispute, with other property alleged to belong to the execution-defendant. The plaintiff making claim to the team, etc., Williams gave to the sheriff a bond of indemnity, and on September 15th, the property was sold at sheriff's sale.

At the close of the testimony, the court, GUNNISON, P. J., charged the jury:

In this case, there is no evidence to justify you in finding actual fraud. Actual fraud must be proven, and cannot be inferred or presumed. And you are instructed in this case, that there is no evidence upon which you would be justified in finding that there was any actual fraud in the sale of this property to Mr. Stephens. If you believe the testimony of Mr Chadwick, and Mr. Keefer and Mr. Stephens, the property was sold to Mr. Stephens on the 29th day of May, the day following that upon which the transaction was closed. A valuable consideration was paid for the property. Mr. Mulkie owed Mr. Stephens a certain amount of money, and it was agreed between them that he should take this property and that Mr. Mulkie should credit

Charge of Court below.

him with the amount agreed upon, $550, and that was as valuable a consideration as if he had paid him $550 in cash. As far as the transaction of the sale is concerned, you would not be justified in finding that it was otherwise than honest and fair. So, the only question you have to decide is whether there was such a transfer of possession from Mr. Mulkie to Mr. Stephens as the law requires. If there was, then there was no constructive fraud. If there was not such a change as the law requires, there was a constructive fraud, and in that case your verdict should be for the defendants.

Mr. Stephens testifies that he had an interview with Mr. Mulkie several days before May 29, 1888, and there was an understanding that if he could make an arrangement satisfactory to himself he would take the property at the price agreed upon. At the same time, he made arrangements, in case he should accept Mr. Mulkie's proposition, for Mr. Keefer to take charge of the property for him. On the 29th day of May he wrote a letter to Mr. Mulkie agreeing to take the property, and that letter was received by Mr. Mulkie on the 29th of May, and on the 30th of May Mr. Mulkie's book-keeper, under the instructions of Mr. Mulkie, charged Mr. Stephens in his account with the amount agreed to be paid for the property, $550. On the very day upon which this letter was written and upon which Mr. Mulkie received the letter, if you believe the testimony of Mr. Mulkie and Mr. Keefer, Mr. Mulkie delivered the possession of this property to Mr. Keefer on the public highway in the city of Corry, and then and there discharged him from his employment.

Now, that is a very important matter for you to consider in determining this case; because, if Mr. Mulkie had not discharged Mr. Keefer on that day from his employment, then there might be evidence to justify you in finding that there was no change of possession, because the possession remained in Mr. Keefer, who had before had possession and charge of the property, and he would still be the servant of Mr. Mulkie, and his possession might still be considered by you to be the possession of Mr. Mulkie. [But if he discharged him on that day from his employment, and delivered the possession of the property to him, and upon his discharge Mr. Keefer entered the employment of Mr. Stephens, then it would be the possession of Mr.

Charge of Court below.

Stephens;] [1] because the delivery of possession to Mr. Stephens's servant would be equivalent to delivering possession to him in person.   Then, the testimony of Mr. Stephens and Mr. Mulkie is that it was kept in the same barn and stable of course as before, but Mr. Mulkie tells you that Mr. Keefer had the key and that Mr. Mulkie had no access to the barn except by applying to Mr. Keefer for the key, and with Mr. Keefer's consent, and that Mr. Mulkie was never in the barn afterwards. Now, if that is so, the fact that they were kept in the same premises would not be sufficient to defeat the right of the plaintiff.   The delivery of possession may be made in various ways. It may be by the vendor manually handing the property to the vendee, or it may be by his withdrawing from the possession and presence of the property.   And if Mr. Mulkie discharged Mr. Keefer and Mr. Stephens employed him, and Mr. Keefer then as agent of Stephens had possession of the barn, and Mr. Mulkie was removed from his occupancy of the barn, that would be a sufficient transfer of the possession to vest a perfect title in Mr. Stephens to this property as against the creditors of Mr. Mulkie.

The mere fact that a few articles of Mr. Mulkie, of small value, remained in the barn and stable, as an old harness and shovel and broom, etc., would not be sufficient to defeat the title of Stephens, providing Mr. Mulkie had no possession of the barn himself; and if you believe his testimony, it was a part of the arrangement, at the time of the sale, that Mr. Stephens should have this barn in which to keep his horses, and wagon, and harness until he should dispose of them; and, if the testimony of Mr. Mulkie and Mr. Keefer is correct, Mr. Keefer, as the servant of Mr. Stephens, had perfect and exclusive and not concurrent possession, and that possession would be the possession of the master, Mr. Stephens.   ·[And, if it were not for the fact that Mr. Keefer had made some statements to the sheriff, and perhaps before the legal arbitrator, that were slightly inconsistent with this statement, you would be instructed peremptorily to bring in a verdict for the plaintiff.] [2]   But the fact that there were such inconsistent statements makes it a proper question to submit to you, as to whether the transfer of possession was as claimed by the plaintiff. . . . .

Counsel for the defendants have asked the court to answer specifically certain points presented.

Charge of Court below.

3. If the jury, in considering the question of possession aforesaid, find from the evidence that after May 29, 1888, Keefer, the driver, was the legal bailee of Stephens, that will not avail the plaintiff, if it was contrary to the visible ownership and possession, and the verdict must be for the defendants.

Answer: This point is affirmed also. If there was no such change of possession as to enable the public upon proper inquiry to find out who had possession of it, then there was not such a change of possession as the law required.[3]

4. That, if, from the evidence, the jury find said alleged sale and purchase to and by Stephens to have been honest and for value, yet that there was not such an open, notorious and visible change of possession from said Mulkie to plaintiff as would be apparent to the public, the same is a fraud in law and not binding on the defendant Williams, one of the creditors of said vendor Mulkie, at the time of said alleged sale to Stephens, and the verdict must be for the defendants.

Answer: This point is refused. Whether or not there was such a change of possession of the property as will prevail against the defendant Williams, is a question of fact for the jury, under the evidence and under the instruction of the court as to the principles of law applicable to the case.[4]

6. That if the jury find from the evidence that such alleged sale was made from Mulkie to plaintiff, and that after the same, May 29, 1888, up to the attachment of the lien of Williams's writ, June 2, 1888, 11.40 A. M., the team and property in question was fed and cared for by the same driver, Keefer; fed, cared for and stored in the same barn and on the same premises of Mulkie the same as before said alleged sale of May 29, 1888, then there was no such change of possession as in this case was required by law, and said sale, no matter how honest in fact, was a fraud in law and the verdict must be for defendants.

Answer: If the jury find from the evidence that after the date of the sale from Mulkie to the plaintiff, and prior to the delivery of the writ of Williams to the sheriff, the team and property in question were fed and cared for by the same driver Keefer; fed and cared for and stored in the same building or room and on the premises of Mulkie the same as before the alleged sale of May 29, 1888, then there was not such a change of possession as in this case was required by law. But if they

Arguments.

find that the property was not fed and cared for as before, but that on May 29, 1888, Mulkie delivered the property to Keefer as the servant of the plaintiff; that at the same time he discharged Keefer from his employment; that Keefer thereafter had possession of the property as the servant of the plaintiff, upon premises or in a stable to which Mulkie had no access except on application to and with the consent of Keefer, that amounted to a sufficient change of possession such as would vest the title of the property in the plaintiff as against the defendants and the creditors of Mulkie.

10. That, if from the evidence the jury find that the property in question was, after the alleged sale from Mulkie to Stephens of May 29, 1888, up to the lien of defendant's execution, June 2, 1888, 11.40 A. M., kept in the same barn, building and premises where Mulkie's property was, then at the least, if in all other respects the possession was perfect, it would not be an exclusive possession in Stephens, and the verdict must be for the defendants.

Answer: This point is refused.[5]

11. That, from all the evidence, the alleged sale was and is a fraud in law by reason of there being no such change of possession and open,.notorious, visible, apparent and exclusive possession as in this case is required by law, and the verdict must be for the defendants.

Answer: This point is refused.[6]

12. That from all the evidence the jury would not be justified in finding for the plaintiff.

Answer: This point is also refused.[7]


The jury returned a verdict for the plaintiff for $599.50. Judgment having been entered, the defendants took this appeal, assigning for error:

1, 2. The portions of the charge embraced in [ ] [1] [2]

3–7. The answers to the defendants' points.[3] [to] [7]


*Mr. C. George Olmstead* (with him *Mr. S. M. Brainard*), for the appellants:

The court below erred in qualifying the answer to the defendants' third point as follows: "If there is no such change of possession as to enable the public, upon proper inquiry, to

find out who had possession of it." This was of itself enough to mislead the jury and defeat the rights of the defendants, for we had shown no inquiry. There is no law charging the public or creditors with inquiry as to whether the debtor has sold his property, when it is kept upon the premises and cared for the same as it had been before the alleged sale. The question was, how was the team kept, etc.? It must indicate to the public an actual change of possession: Worman v. Kramer, 73 Pa. 378. And, whether the sale to the plaintiff was accompanied by a corresponding change of possession required by the law, it was error to leave as a question of fact for the jury: Hoffner v. Clark, 5 Wh. 544.

*Mr. J. W. Sprowl* (with him *Mr. A. F. Bole*), for the appellee:

1. The court below left the question of delivery to the jury in a remarkably clear and explicit charge as to what constitutes delivery; and there can be no question that Keefer had exclusive possession of the barn where the property was kept, that Mulkie never was there after Stephens's purchase until he went to the sheriff's sale, and that Keefer had the key and was then in the employ of Stephens. The vendor must make such an actual delivery, only, as the nature of the property and the circumstances of the case will reasonably admit; and the separation may be made by the vendor's surrender and the transfer of his power and control over it: Barr v. Reitz, 53 Pa. 256; McMarlan v. English, 74 Pa. 296; Billingsley v. White, 59 Pa. 464; Evans v. Scott, 89 Pa. 136.

2. "In determining the kind of possession necessary to be given, regard must be had, not only to the character of the property, but also to the nature of the transaction, the position of the parties, and the intended use of the property. No such change of possession as will defeat the fair and honest object of the parties is required: Mr. Justice MERCUR, in Crawford v. Davis, 99 Pa. 576; McClure v. Forney, 107 Pa. 414; Hugus v. Robinson, 24 Pa. 9; Boud v. Bronson, 80 Pa. 360; Renninger v. Spatz, 128 Pa. 524. Moreover, the public could in no way have been misled, for Mulkie never had the actual or manual possession of this team; it was a team that seemed to pass with or belong to the refinery. Keefer used it, and had

the possession or control of it; he was then in law the 'bailee
of Mulkie, and a change of his possession was unnecessary:
Worman v. Kramer, 73 Pa. 378; Linton v. Butz, 7 Pa. 89;
Woods v. Hull, 81* Pa. 451.

OPINION, MR. JUSTICE WILLIAMS:

The character of the argument in this case leads us to believe
that in some portions of the state there is a tendency to regard
the authority of the earlier cases relating to fraud in law in the
sale of personal property as seriously impaired, and to treat such
sales as valid, or not, according to the finding of a jury upon
the existence of fraud in fact in the transaction. It may be
well, therefore, to examine our cases, in order to make their ef-
fect and the present state of the law upon this subject clear.

The distinction between real and personal property is famil-
iar even to laymen. Such property as may attend the person
of the owner is called personal. It is in his presence and pos-
session, and under his control. The evidence of his ownership
is, prima facie, in his actual hold on or possession of the articles,
and proof of his possession makes a sufficient showing of title
to sustain an action against a wrongdoer. A sale of a chattel
is a transfer of the property in it for a consideration. It is or-
dinarily effected by the delivery of the thing sold to the buyer,
and the delivery of the price or a security therefor to the seller.
The transfer of the property in the thing is effected by the
transfer of the thing itself to the possession of the purchaser.
But, while this is the general rule, it is true that parties may
modify it within certain limits by their contracts, and may make
sales on such terms and conditions as are convenient to them.
But when such terms and conditions are prejudicial to others, or
are calculated to mislead the public, they will be held to be void
as to those who would otherwise be injuriously affected by them.
It may be convenient for the parties to agree that the title to
the thing sold shall remain in the seller as a security for the
price to be paid; and, so long as the rights of no persons but
themselves are affected by it, the agreement may be enforced
according to its terms. As to purchasers from and creditors of
the buyer, however, such an arrangement gives him a deceptive
appearance of ownership and a false credit, and for protection
of such purchasers and creditors, the private agreement between

himself and his vendor will be disregarded. The reservation of the title, notwithstanding an agreement of sale and an actual delivery in pursuance of it, may be good between the parties, but, as to all persons dealing with the buyer without notice of the reservation, it is without force and void: Rose v. Story, 1 Pa. 190; Edwards' App., 105 Pa. 103. Such an arrangement cannot be sustained as a bailment. It is of the essence of a contract of bailment that the article bailed be returned, in its own or some altered form, to the bailor, so that he may have his own again: Benjamin on Sales, 6. In contracts of sale, however, the seller stipulates for a price as the equivalent of his goods. The buyer takes the goods as owner; the seller accepts the price in exchange for them. If the seller delivers the goods without demanding payment, he takes the risk of the integrity and solvency of the buyer. If the buyer pays the price without taking possession of his goods, he takes the risk of the integrity and solvency of his vendor, and a subsequent bona fide purchaser will take a good title. This was held in Clow v. Woods, 5 S. & R. 275, followed not long after by Babb v. Clemson, 10 S. & R. 419. The rule laid down in these cases has been recognized and applied in a long line of decisions extending from 1819 to the present year. Among these are Streeper v. Eckart, 2 Wh. 302; Eagle v. Eichelberger, 6 W. 29; Young v. McClure, 2 W. & S. 147; Barr v. Reitz, 53 Pa. 256; Crawford v. Davis, 99 Pa. 576; Miller v. Browarsky, 130 Pa. 372.

The result of the cases seems to be that, when one comes into possession of personal property, those who deal with him on the credit of such property must inquire into the origin and nature of his possession, so as to know whether he is a purchaser or a bailee. When it is learned that he is a purchaser, his continued possession of the same goods affords a basis for the presumption of continued ownership, and this is a conclusive presumption in favor of bona fide purchasers and creditors. Under such circumstances, there is nothing to suggest the necessity for further inquiry into the character of the possession, and for that reason there is no duty to make it. If, therefore, the owner of goods sells them to A, but retains the possession, and afterwards sells them to B, an innocent purchaser who takes possession, the title of A is gone. It is of no consequence that he acted in good faith and paid a fair price, nor

that his reasons for leaving the goods with his vendor were such as grew out of his confidence in or desire to aid him. The fact that the goods were left in the hands of their former owner, with nothing to indicate that his relation towards them was changed, put it in his power to sell them again for a full price to an innocent purchaser. When he makes such sale, one of the purchasers must lose the money he has paid. Assuming that both are alike honest, on which of them ought the loss to fall? Clearly on him whose act or omission has made or contributed to make the loss possible. This result is reached by treating the neglect to take possession as a constructive fraud upon the last purchaser, without regard to the existence of fraud in fact. The failure to take possession left the former owner in the same apparent relation to his goods as before, and made it possible for him to sell them again. The consequences to the second purchaser are the same, if the title does not pass to him, as though the first sale had been contrived for the express purpose of defrauding him of his money. Looking at results, the law declares the first sale to be a fraud as to subsequent purchasers and creditors, and so fixes the loss on the person who ought to bear it.

This rule was stated by the courts of the United States as early as 1803, in Hamilton v. Russell, 1 Cranch 310. It had been applied by the English courts still earlier. The leading case in England seems to be Edwards v. Harben, 2 Term R. 587. The point in controversy in that case is thus stated in the opinion of the court: " This case has been argued by the defendant's counsel as being a case in which the want of possession is only evidence of fraud, and not such a circumstance, per se, as makes the transaction fraudulent in point of law ; " and the court held, adversely to the position of defendant's counsel, that a sale of personal goods without a delivery of possession was a fraud in law upon a subsequent bona fide purchaser. The controversy over the point raised in Edwards v. Harben has been continued on both sides of the Atlantic, and in some courts is still an open one. In some of the states it has been settled by statute. In New York the statute provides that " every sale made by a vendor of goods and chattels in his possession or under his control, . . . . unless the same be accompanied by an immediate delivery, and be followed by

Opinion of the Court.

an actual and continued change of possession of the things sold, . . . . shall be presumed to be fraudulent and void as against the creditors . . . . . of the vendor . . . . . or subsequent purchasers in good faith; and shall be conclusive evidence of fraud, unless it shall be made to appear on the part of the person claiming under such sale . . . . . that the same was made in good faith, and without any intent to defraud such creditors or purchasers." Under this statute, the courts of New York must, in all cases where the conflict is between a first and a subsequent purchaser, submit the bona fides of the conduct of the first purchaser to a jury, with an instruction to sustain his title regardless of the want of a delivery, unless his conduct was fraudulent in fact. Similar statutory provisions exist in several other states, and the course of decision in such states has been controlled by them. Our own legislature has refrained from any interference with the rule so well settled by the courts, and so just and salutary in its operation. It still rests, therefore, on the same foundation on which it was originally put, as appears by the recent case of Miller v. Browarsky, decided in November last. This court said, in that case, that the law imputes fraud to the first purchaser because of his laches. His neglect to do what he ought to have done for the protection of others requires that he should be postponed in favor of those who must otherwise lose by his conduct. His motives are not material. The consequences of his neglect to take possession are none the less serious to subsequent purchasers, because no harm was intended. His liability grows out of his acts or omissions, not out of his intentions. Assuming that his conduct is free from actual fraud, yet he, or the subsequent vendee, must lose, and it is a proper case for the application of the maxim of the common law that, when a loss must fall on one of two innocent persons, it ought to fall on him whose act or omission caused it.

It is, as we have seen, well settled in this state that it is the duty of the purchaser of personal property to take possession of the goods purchased, but the question remains, what is a sufficient taking of possession to protect the purchaser? This question has been answered in a line of cases which begins with Eagle v. Eichelberger, 6 W. 29. In that case, this court said that the duty of the purchaser was affected by the nature

of the transaction, and that a delivery in accordance with the usages of the trade or business in which the sale was made was a sufficient delivery. In Hugus v. Robinson, 24 Pa. 9, it was further said that the delivery must be such as usually and naturally attends such a transaction, and that the purchaser taking such possession has fully discharged his duty to the public. Barr v. Reitz, 53 Pa. 256, presented the question on a new state of facts. The owner of household goods sold them, moved out of the house in which they were, and delivered the keys to the purchaser. We held on these facts that the previous visible relation between the owner and his goods was broken. Whether the goods were removed from the house in which the owner remained, or the owner removed from the house where the goods remained, the visible relation between them was broken, and the public was put on the duty to inquire. McMarlan v. English, 74 Pa. 296, was the case of a sale of a stock of goods in a store, of which possession was taken in bulk. This was held sufficient, and it was said that, in fixing upon the duty of the purchaser, the nature of the property, the relation of the parties to it and to each other, must be considered, and the possession taken of the stock must be such as was usual in such cases, and consistent with the nature and situation of the goods, looked at in connection with the business for which they were held. In Evans v. Scott, 89 Pa. 136, it appeared that two brothers lived together in the same house. One owned all the furniture. The other bought a carpet on credit, which was laid in the house. When the credit expired, he did not pay for it. The other then went to the seller, paid the price, and had a bill of sale made to himself. This was held to give him a title, and it was said that, in considering the question of possession, his relation to the house and its furniture must be taken into the account. The results of these cases were summarized in Crawford v. Davis, 99 Pa. 576, where it was said that the character of the property, the use to be made of it, the nature and object of the transaction, the position of the parties, and the usages of the trade or business are all to be considered in deciding the sufficiency of the possession taken by the purchaser. This was repeated in McClure v. Forney, 107 Pa. 414, and in Renninger v. Spatz, 128 Pa. 524.

Opinion of the Court.

Another line of cases began with Linton v. Butz, 7 Pa. 89, in which it was held that the purchaser was not bound to take actual possession, where the vendor was not in possession at the time of the sale. In that case, the article sold was in the hands of a bailee, and the delivery of an order on him for it was held to be a sufficient delivery of the article. So, goods in the hands of a carrier or stored in a warehouse may be delivered by a delivery of the bill of lading or the warehouseman's receipt: Bond v. Bunting, 78 Pa. 210. All these cases recognize the rule, while they qualify it as the circumstances require in order to make its application just. The general rule undoubtedly is that the purchaser of goods must, for the protection of the public, take such possession as is usual and reasonable in view of all the circumstances of his purchase. If he neglects this obvious duty, then, as between himself and subsequent vendees or creditors, he must bear the loss resulting from his neglect.

Such being the law in this state, it only remains to apply it to the case before us. The property in controversy is a pair of horses, harness, and wagon. The former owner was Mulkie; the present claimant is Stephens. Mulkie owned an oil refinery in Corry which was enclosed with a high fence. Among the buildings in the enclosure was one used as a barn, in which the horses, harness, wagon, and some other property of Mulkie were kept. The horses were groomed and driven by Keefer, an employee of Mulkie, who also carried a key to the barn. Stephens was a cooper, living in Titusville, who supplied the refinery with barrels. In May, 1888, he met Mulkie in the street in Corry, who proposed to sell him the horses, harness, and wagon to apply on his account for barrels. The property was not present, and Stephens did not go to see it or make any bargain for it. On the 29th of May, as he testifies, he wrote from Titusville proposing to take the property on account at $550. Three days later a fieri facias was issued against Mulkie, and the property was seized and sold by the sheriff as his. When seized the property was in Mulkie's barn on the refinery property, under the care of Keefer. Stephens brought this action to recover the value of the property. It is not alleged that he ever took possession of the property in person, or that he sent any one to take possession for him, but he claims to have been

Opinion of the Court.

in actual possession by force of the following circumstances, viz.: (*a*) That he had an arrangement with Mulkie for the use of the stables until he should be ready to move the property; (*b*) that he had an arrangement with Keefer to continue to care for it; (*c*) that Keefer carried the key to the barn. By virtue of these arrangements he urges that he became a lessee of the barn, an employer of Keefer, and a purchaser in actual possession of the property. But what change had taken place in the relation between Mulkie and his property? The barn remained within his enclosure. The property remained in the barn. Keefer remained in care of it. There was not the slightest visible change in any particular in the relation of Mulkie to the barn, the personal property, or the employee in charge of it. Keefer carried the key and drove the team, after the letter of May 29th, just as before. The team was kept in the same place inside the refinery yard, and Mulkie was in the same visible possession of the refinery. The property was capable of an actual delivery, and was such as usually and naturally passes to a purchaser by delivery. It was the duty of Stephens to take possession of it in the manner that is usual upon a sale of such articles, so that the visible relation between the former owner and the goods should be changed. Failing to do this, he must not complain of the consequences.

The law was well stated in the defendant's fourth, tenth, eleventh, and twelfth points, by which an instruction to the jury was asked to the effect that, if there was no visible change of possession, the sale was fraudulent in law, notwithstanding the jury might find that Stephens and Mulkie had acted honestly in the transaction. The learned judge refused so to charge, and in answer to defendant's third point told the jury that the public was bound to make "proper inquiry" about the title to the property, overlooking the fact that the evidence disclosed no reason for inquiry, or for doubting the continued ownership of Mulkie. This instruction seems to have been influenced by a supposed analogy between this case and Barr *v.* Reitz, 53 Pa. 256. In that case the seller moved out of the house in which he had been living and in which the goods were, and delivered the keys of the house to his vendee. His former relation to his goods was visibly broken, and the public was thereby put upon inquiry. In this case, Mulkie remained in

Syllabus.

possession of the refinery; the property remained in the stable within the enclosure; the key was carried by the same person, who went out and in just as before; and, so far as the public could see or know, there was no change in the relation pre-viously existing between Mulkie and his stable, or the property in it, or the hired man in charge of it. There was no delivery of possession to Stephens, and, as against subsequent purchasers and creditors, he had no title.

The judgment is reversed.