### In re GEBBIE & CO.

(District Court, E. D. Pennsylvania. February 18, 1909.)

#### No. 2,779.

BANKRUPTCY (§ 143*) — PROPERTY PASSING TO TRUSTEE — PROPERTY SUBJECT TO PROCESS—ATTEMPTED PLEDGE BY BANKRUPT.

Bankrupt, a corporation engaged in publishing and selling books, some two years before the bankruptcy entered into a contract with claimant, a creditor, by which it purported to transfer to claimant certain books contained in a room on its premises, and to lease such room to claimant. It provided, however, that the president of the bankrupt should be sole agent for claimant, with authority to sell any of such books in his discretion, and he retained the key to the room; also, that on payment of the recited debt the books unsold should be retransferred to the bankrupt, and that in the meantime they should not be removed by claimant except on certain defaults, when it had the right at its option to sell the same and credit the proceeds to the bankrupt. It had not exercised such option at the time of the bankruptcy, and the books were taken possession of by the trustee. Held, that there was no such change of possession as to constitute a sale or pledge valid as against execution creditors of the bankrupt under the law of Pennsylvania, and that the property, being subject to levy, passed to the trustee under Bankr. Act July 1, 1898, c. 541, § 70a, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3451).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 143.*]

In Bankruptcy. On certificate of referee.

C. W. Van Artsdalen, for Mercantile Guaranty Co.
Samuel W. Cooper, for trustee.

J. B. McPHERSON, District Judge. This is a dispute between the Mercantile Guaranty Company and the bankrupt's trustee concerning their respective rights to certain books, which at one time were undoubtedly the bankrupt's property, but are now claimed by the guaranty company under an agreement made in January, 1905, more than two years before the creditors' petition was filed. Asserting this claim, the guaranty company attempted to offer the books for sale several weeks after the adjudication, but was met by the trustee's application for a restraining order, and thereupon agreed that the

---

whole matter should be submitted to the referee for his determination. He has found that the title, ownership, and right to the possession of the property is in the trustee, and at the request of the guaranty company has certified the controversy to the court. There was little conflict of testimony, and the facts that are necessary to explain the situation of the parties and to throw light on the agreement in question appear in the following report of the learned referee (Theodore M. Etting, Esq.):

"Gebbie & Co. is a Pennsylvania corporation. Its business was that of publishing and selling books. George Gebbie was and continued to be its president up to the time of bankruptcy. At and before the execution of the contracts under which the Mercantile Guaranty Company claimed, and until a short time previous to the bankruptcy, the business of the corporation was carried on at premises 714 Spruce. street in the city of Philadelphia, the premises in question being leased from the mother of George Gebbie. Gebbie & Co. was adjudged a bankrupt April 12, 1907, upon a petition filed April 11, 1907. The trustee in bankruptcy found the property in dispute, with other stock of the bankrupts, on the above premises, and took possession of them in the course of the administration of the estate. The Mercantile Guaranty Company some time afterwards, acting under a power of sale contained in an agreement which will be referred to hereafter, and which was executed between Gebbie & Co. and the Mercantile Company on the 14th of January, 1905, advertised the property in dispute, which consists of certain books and engravings contained in a room in 714 Spruce street, the premises above referred to, for sale at auction for account of whom it may concern, and thereupon the trustee in bankruptcy made application for an order restraining the guaranty company from making the sale or from interfering with his title or possession. The essential averments in the trustee's petition are that the books and engravings are in his possession, that they were never delivered to the claimant by the bankrupt or passed into its possession, that they formed part of the bankrupt estate, and that he is entitled to sell them. The claimant in its answer denies that the property is part of the bankrupt estate. or that it ever came into the possession of the trustee, or that he has any title thereto. It is averred that, at the time of the commencement of the bankruptcy proceedings, neither the room nor the building were occupied by the bankrupt. The room, it is averred, had been leased to the Mercantile Guaranty Company by Gebbie & Co. since January 14, 1905, and it since then had been in the exclusive possession of that company. The remainder of the building, it is averred, at the time of the commencement of the bankruptcy proceedings, was in the possession of the Gebbie Book Company. The title to the books is claimed under a sale, made contemporaneously with the execution of the lease above referred to, and exclusive possession thereafter. The sale was stayed pending the determination of the question, and testimony was taken on the petition and answer. At 'the close of the testimony, and in order to avoid circuity of action, counsel for trustee and claimant entered of record the agreement first above referred to.

"The Mercantile Guaranty Company is a New York corporation having its principal office in the city of New York. It had no office for the transaction of business in Philadelphia. or at any other place within this commonwealth. On the 14th of January, 1905, an agreement was made between Gebbie & Co. and the Mercantile Guaranty Company, by the terms of which certain books and engravings contained in a schedule annexed to the said agreement, and which comprised the property in dispute, and which were then in the room adjoining the first floor office of Gebbie & Co., 714 Spruce street, were sold by Gebbie & Co. to the Mercantile Guaranty Company, and a lease for said room, bearing even date with the execution of said agreement, was given by Gebbie & Co. to the Mercantile Guaranty Company. Both the agreement and lease bear the signature of Gebbie & Co., by George Gebbie, president. At the time of the execution of the above agreement and lease Gebbie & Co. was indebted to the guaranty company in the sum of $11.252.25, which indebtedness had been incurred in November, 1904, and as collateral security for the payment of this

indebtedness, the guaranty company then held certain book contracts or leases, which Gebbie & Co. had guaranteed but which were in default. The guaranty company also held in its hands certain other book contracts or leases known as collection accounts. The above collateral not being considered sufficient by the guaranty company, a demand for additional collateral was made, and the agreement executed January 14, 1905, grew out of this demand. The books and engravings referred to in the agreement were then in a room back of the general office of Gebbie & Co., access to which was had by a door opening from the hallway. The room was quite dark. It was impossible for any person visiting the premises of Gebbie & Co. to see the interior of this room or its contents from the rest of the premises. The door leading to the room was kept locked. George Gebbie and two other persons connected with Gebbie & Co. had access to the room by keys. These keys, it appeared, opened another room as well, and were in the possession of all of the persons referred to before the execution of the agreement, and they remained in their possession thereafter. The books referred to in the agreement were in the room prior to the execution of the agreement. They were not specifically selected and set aside at the time of the agreement, but there had been a stock-taking a few weeks previous, and there can be no doubt under the evidence that they were in the room when the agreement was made, that they remained there continuously thereafter, and that they were at all times kept separate and apart from the other stock of Gebbie & Co. The total retail price of the books and engravings above referred to, as set out in the schedule contained in the agreement, is $97,740.50. By the terms of the agreement, the books and engravings in question were granted, bargained, and sold unto the guaranty company, subject, however, to the following conditions: That during the continuance of the agreement the guaranty company should not remove the books from the room or offer them for sale except through George Gebbie; that George Gebbie should have the exclusive right to sell them as agent for the guaranty company, with the power of appointing agents under him, and he was authorized to sell them at any fair price which to him seemed most advisable. In consideration for the transfer of the above property, the guaranty company agreed to give Gebbie six months from the 1st day of January, 1905, in which to pay its indebtedness of $11,252.25, and further agreed as to the amounts and conditions of payment, which in substance were that the guaranty company was to give Gebbie & Co. credit for all amounts collected or received by it from the book contracts or leases which it then held as collateral, and that, unless that sum made a payment in excess of the balance due, Gebbie & Co. was to pay the guaranty company $500 monthly. The cash or notes received from the sale of the books was to be kept in a separate account, monthly statements rendered showing the number and names of the books sold, and the amount received was to be remitted and credit was to be given to Gebbie & Co. for the money thus received on account of this indebtedness. It was further agreed between the parties that if on or before the 1st day of July, 1905, the indebtedness of Gebbie & Co. was not paid, that the guaranty company could then demand the full balance due upon tendering to Gebbie & Co. a good and sufficient bill of sale for the books then unsold, and, in the event of the failure of Gebbie & Co. to pay the balance due within five days, the guaranty company was authorized to sell the books then unsold to the highest responsible bidder, at either public or private sale. The proceeds of sale, less reasonable expenses, were to be applied to the account of the indebtedness, and the balance, if any, after payment, was to be paid to Gebbie & Co.; or the guaranty company could at its option, under the terms of the agreement, in the event of the debt not being paid on or before July 1, 1905, allow the agreement to continue from month to month upon the conditions hereinbefore referred to, having the right within the first ten days of any month to demand the balance due, and upon tender of a bill of sale to proceed in the event of nonpayment to sell at either public or private sale the books and engravings then unsold as above provided, the proceeds of said sale to be applied to the account of said indebtedness, and the balance, if any, after payment, to be paid to Gebbie & Co.

"From the terms of this agreement, it is clear that, whilst the title to the books was transferred to the guaranty company, its ownership therein was

shorn of every right ordinarily incident thereto. The guaranty company could not remove the property from the room; it could not offer it for sale; it could not make a sale directly. The only person who could sell was George Gebbie, the then president of Gebbie & Co., or agents appointed by him. There was no obligation on the part of Gebbie to sell any of the books, inasmuch as it was quite possible that the debt could have been discharged on or before July 1st, or at a later period, from other sources of payment. If he elected to sell, it was at such prices as seemed to him most advisable. Such of the property as had not been sold was upon payment of the debt to be resold to Gebbie & Co. The total indebtedness of Gebbie & Co. at the date of the agreement was about $11,000, and the total retail price of the books as set out in the agreement was $97,740. The real consideration for the agreement was the extension of time granted to Gebbie & Co. in which to pay the above-mentioned indebtedness. Between the date of the agreement and the commencement of the bankruptcy proceedings, comparatively few books were sold. Several visits to the premises were made by the president of the guaranty company. and dissatisfaction was expressed at the slowness with which the debt was being liquidated or the books sold; but beyond satisfying himself that the books had not been removed or otherwise disposed of, nothing appears to have been done with respect to them, other than as heretofore stated, until shortly before or shortly after the commencement of the bankruptcy proceedings. At this time demand was made for payment of the debt, a bill of sale was tendered. and an endeavor made to sell the books under the power contained in the agreement. Contemporaneously with the execution of the agreement of the 14th of January, 1905, Gebbie & Co. made a lease to the Mercantile Guaranty Company for six months from the 1st of January, 1905, of its first floor office in premises 714 Spruce street, this being the room in which the property above referred to was kept. By the terms of the lease, the rent, which was fixed at six dollars a month, was made payable in advance, but by the terms of the agreement the guaranty company was to be released from its liability upon payment of its debt and upon tendering a bill of sale. It appears from the evidence that the guaranty company paid no rent. In February, 1907. Gebbie & Co. became embarrassed, and in consequence its business was sold to the Gebbie Book Company. Gebbie & Co. ceased to do business after February of 1907, or to pay rent for the premises. As certain property taken over by the Gebbie Book Company, but not as yet paid for, remained on the premises. the building appears to have been occupied by both companies, but Gebbie & Co. assumed no liability for rent, and paid no rent after February, 1907. No change was made in the use of the room in which the property in dispute was stored.

"The contention of the claimant is that there was sufficient transfer of title and delivery on January 14, 1905, to vest title in the guaranty company, but in any even that, inasmuch as no part of the building was in the possession of or under the control of the bankrupt at the time of bankruptcy, or for several months prior thereto, if there had not been a sufficient delivery on January 14, 1905, any defect was remedied at the time when the Gebbie Book Company succeeded Gebbie & Co. and the latter withdrew.

"Counsel for the trustee relies upon the case of Security Warehousing Co. v. Hand (recently decided) 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117. This case is in certain respects, I think, on all fours with the case at bar. In Stephens v. Gifford, 137 Pa. 219, 20 Atl. 542, 21 Am. St. Rep. 868, the Pennsylvania rule with respect to transfer of personal property is reviewed and considered. There can be no doubt that, in determining the sufficiency of the transfer of title, the law of the state must govern. The rule laid down in Stephens v. Gifford is that transfer of property of the nature of that now under consideration is ordinarily effected by transferring the thing itself to the possession of the purchaser, but that parties may within certain limits by their own contracts modify this rule; but that if such terms and conditions are prejudicial to others or are calculated to mislead the public, they will be held to be void as to those who would otherwise be injuriously affected by them. If a purchaser pays the price without taking possession of the goods, he takes the risk of the integrity and solvency of the seller. A purchaser must, for the protection of the public, take such possession as is usual and rea-

sonable in view of all the circumstances of his purchase. If he neglects this obvious duty, then, as between himself and creditors, he must bear the loss resulting from his own act. The facts in the case under consideration were substantially as follows: The purchaser of a team of horses arranged with the seller for the use of the stable in which the horses then were until he should be ready to move them. He also arranged with the keeper to continue in care of them. The keeper carried the key to the stable in which the horses were kept. By virtue of these arrangements, the contention was that the purchaser became the lessee of the stable, the employer of the keeper, and a purchaser in actual possession of the property. The sale was declared fraudulent on the ground that there had been no change in the visible possession of the horses.

"In Security Warehousing Co. v. Hand, there was no change of possession in fact, and the only possession in form was, as in the present case, by virtue of a lease; and there, as here, there was no change made in the actual possession of the property, or no change made in its visible possession. There, as here, the only agents on the scene were the agents of the pawnor. It was held that there had been no change in possession, that the method adopted was a mere device or subterfuge.

"In order to give any validity to the agreement now under consideration, it must necessarily be regarded as either a pledge or a sale. In either event delivery is a necessary incident. It is a mere trifling with words to call George Gebbie the agent of the guaranty company, or at all events, if an agent at all, his agency was restricted to the power of sale. The agreement precluded the guaranty company from removing the property from the room. The clear intent of the agreement was that the actual possession and custody of the books should not be changed, and that they should remain after the agreement where they were before its execution, and that Gebbie & Co., through George Gebbie, its president, should have the same right to fix the price and to sell as before. The actual possession was unchanged. The property could have been levied on and sold under judicial process against Gebbie & Co. at the time of the adjudication in bankruptcy.

"A delivery, to be effectual in Pennsylvania, must be made either at the time of the sale or within a reasonable time thereafter. It is immaterial whether Gebbie & Co. or the Gebbie Book Company was in possession in February, 1907. In Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779, the requirement of possession as laid down by Mr. Justice Bradley, is: 'A pledge may be in the temporary possession of the pledgor as special bailee, without defeating the legal possession of the pledgee; but where it has never been out of the pledgor's actual possession, and has always been subject to his disposal by way of collection, sale, substitution, or exchange, no pledge or privilege exists as against third persons.' It cannot, I think, be maintained in the case at bar that there was any real change in the actual possession of the property. Whilst it is generally true that the trustee in bankruptcy stands in the shoes of the bankrupt, and that he holds the property assigned subject to the same equities that the debtor held it, there are many transactions which would be binding on the debtor which would not be binding on the trustee. Indeed, it may be laid down as a general rule that a trustee in bankruptcy may properly oppose any preference or privilege which the law itself, unaided by a bona fide purchase or judgment, would regard as void against the general creditors in a direct contest between them and the parties claiming such privilege or preference, even though the debtor himself, on account of some personal disability arising from his own acts or engagements, could not resist the claim. Where the legal or equitable property in a security passes, and there is no express law invalidating the transfer, the creditor will be entitled to hold as well against the trustee as against the debtor, because the trustee only takes such title as the debtor had at the time of insolvency. As against third persons, neither a sale nor a pledge can be maintained without possession. Want of possession is fatal, though the parties may have acted in good faith. Casey v. Cavaroc, cited supra. The trustee in bankruptcy, in section 70a (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]), is vested by operation of law with the title of the bankrupt to all property transferred by him in fraud of his creditors, and to all property which, prior to the filing of the peti-

tion, might have been levied upon and sold by judicial process against him, and, by subdivision "e" of the same section, the trustee in bankruptcy may avoid any transaction by the bankrupt of his property which any creditor of the bankrupt might avoid, and may recover the property so transferred or its value. By reason of these special provisions, the trustee in bankruptcy can question the sufficiency of the alleged transfer. Security Warehousing Co. v. Hand.

"For the reasons above stated, the conclusion at which I have arrived is that it is a trifling with words to call the transaction between Gebbie & Co. and the guaranty company a transfer of possession from the former to the latter. There was really no delivery, and no such change of possession as the law requires. The alleged change was, as is said in Security Warehousing Co. v. Hand, a mere pretense a sham. The trustee is entitled to possession of the property, and the title and ownership is in him."

In the foregoing report the referee has summarized the agreement of January, 1905, but I think the correctness of his construction will be even more manifest if the agreement be set out in full:

"Whereas the said Gebbie is indebted to the said Guaranty Co. in the sum of $11,252.25, as of the date of November 30, 1904 (as appears by an account hereunto annexed marked Exhibit A), being balance due by reason of the purchase of certain book contracts, or leases, which said contracts have been purchased by and assigned to the said Guaranty Co. as collateral security (a list of which is hereunto annexed marked Exhibit B and known as 'Guaranty Account').

"And whereas the said Guaranty Co. had certain other book contracts or leases of the said Gebbie in its hands for collection, which are known as 'Collection Accounts.'

"And whereas the said Gebbie is the owner of certain books, a list of which is hereunto annexed, marked 'Exhibit C' and is also the owner of the sheets for a set of books known as 'The Complete Writings of Theodore Roosevelt.'

"And whereas many payments on the said book contracts or leases, purchased by and assigned to the said Guaranty Co., are overdue, and in default, which have been guaranteed by said Gebbie, and the said Guaranty Co. has demanded additional collateral security from the said Gebbie for the moneys due thereon.

"Now this agreement witnesseth:

"First: That the said Gebbie, for and in consideration of the sum of one dollar, to it in hand paid by the said Guaranty Co. and the hereinafter mentioned covenants and agreements by the said Guaranty Co., does hereby grant, bargain, sell, release, and confirm unto the said Guaranty Co. all the books set forth in the schedule hereunto annexed marked 'Exhibit C,' now remaining and being in the room adjoining the first floor office of the said Gebbie at 714 Spruce St. in the city of Philadelphia and state of Pennsylvania, for which said room a lease, bearing even date herewith, has been given by the said Gebbie to the said Guaranty Co. and is hereunto annexed, identified by the signatures and seals of the parties hereto.

"Second: That for and in consideration of the premises, and the hereinafter mentioned further covenants and agreements of the said Gebbie, the said Guaranty Co., does hereby covenant and agree to give the said Gebbie six months from the 1st day of January, 1905, in which to pay it the said sum of $11,252.25 now due and owing to it by the said Gebbie. And it further covenants and agrees that the said sum shall be paid in the amounts and upon the conditions following, to wit:

"(a) The said Guaranty Co. is to give the said Gebbie credit upon the said indebtedness of $11,252.25 for all amounts collected or received by it from the said accounts heretofore purchased by it known as 'Guaranty Account,' a list of which is hereunto annexed marked 'Exhibit B' aforesaid.

"(b) The said Gebbie is to pay to the said Guaranty Co. the sum of $500 each month during the continuance of the agreement (unless that sum would make a payment in excess of the balance due, in which event the amount to be paid shall be only that necessary to balance the account or is reduced as is

hereafter provided). The said monthly payments of $500 to be made at the times as hereinafter provided.

"(c) It is further agreed between the parties hereto that any payments on account of the collection accounts, less commission, shall be credited on account of the said required monthly payment of $500 and for the purpose of this agreement, collection accounts shall be all accounts whatsoever in the hands of the said Guaranty Co. other than those heretofore purchased, all of which are set forth in 'Exhibit B' and known as 'Guaranty Accounts.'

"(d) The said Gebbie further agrees to endeavor to sell the sheets for the books known as 'The Complete Writings of Theodore Roosevelt' and that in the event of selling the same during the continuance of this agreement, that it will inform in writing the Guaranty Co. and give the terms of sale and hereby agrees to pay to the said Guaranty Co. upon receipt thereof, fifty per centum of the cash received from time to time from said sale or sales during the continuance of this agreement and said payment shall be credited to the said Gebbie on account of the said indebtedness of $11,252.25 (provided, however, that the amount to be paid is not in excess of the balance due on said indebtedness, in which event, only the amount necessary to balance the said account shall be paid).

"(e) The said Guaranty Co. shall send the said Gebbie a statement between the first and tenth days of each month during the continuance of this agreement showing what moneys it has collected on account of the said accounts known as 'Collection Accounts'; and the said Gebbie shall pay to the said Guaranty Co. the difference between the amount collected from said 'Collection Accounts' and the sum of $500 (the monthly payment provided for in 'Clause B') at any time before the end of the month in which said statement is received, (provided, however, that said payment does not make a payment in excess of the balance due; in which event the amount to be paid shall be only that necessary to balance the account) and it is further provided, that the said Guaranty Co. shall send the said Gebbie a complete statement of the full account between the parties hereto, between the first and tenth days of each month during the continuance of this agreement.

"Third: It is further understood and agreed between the parties hereto that George Gebbie shall have the exclusive right to sell, and is hereby authorized as the agent of the said Guaranty Co. with power of appointing agents under him, to sell at a fair value at all times during the continuance of this agreement, any or all of the books set forth in 'Exhibit C' now remaining in the room adjoining the first floor office at 714 Spruce Street in the city of Philadelphia, aforesaid. The cash or notes received from said sale or sales shall be kept by the said George Gebbie in a separate account, of which monthly statements, showing the number and names of the books sold, the purchaser or purchasers, and the amount received for the same, together with a check for the cash received, or the notes received, or both from said sale or sales, shall be sent to the said Guaranty Co. between the first and the tenth days of each month during the continuance of this agreement. And the said Guaranty Co. agrees to give credit to the said Gebbie for the cash or notes so received on account of its said indebtedness.

"It is further understood and agreed between the parties hereto that the said Gebbie may sell the said books at any fair price, which to him may seem most advisable.

"And it is further understood and agreed between the parties hereto that the said Guaranty Co. shall not remove the said books from the said room adjoining the first floor office of the said Gebbie at 714 Spruce Street in the city of Philadelphia aforesaid, during the continuance of this agreement, and shall not offer these books for sale, except through the said George Gebbie, or his agents, as above provided, during the continuance of this agreement.

"Fourth: It is further understood and agreed between the parties hereto that upon the payment of the full sum of $11,252.25 to said Guaranty Co. as hereinbefore provided, the said Guaranty Co. agrees to give to the said Gebbie a good and sufficient bill of sale for the books set forth in 'Exhibit C' which have not been sold (as hereinbefore provided) : and the said Gebbie, upon receiving the said bill of sale, hereby covenants and agrees to release the said Guaranty Co. from any and all liability on the lease for the said room

adjoining the first floor office of Gebbie at 714 Spruce Street in the City of Philadelphia aforesaid.

"Fifth: It is further understood and agreed between the parties hereto that if the said indebtedness is paid before the full amounts on the said accounts known as 'Guaranty Account' are paid, that the said Guaranty Co. will assign the said accounts, with the balance due thereon to the said Gebbie, or will hold the same for collection as the said Gebbie may direct.

"Sixth: It is further understood and agreed between the parties hereto that of the said indebtedness of $11,252.25 is not paid in full by the said Gebbie on or before the 1st day of July, 1905, that the said Guaranty Co. may demand the full balance then due, upon giving the said Gebbie a statement of the full accounts and tendering to it a good and sufficient bill of sale for the said books set forth in 'Exhibit C' (then remaining unsold) and then in the event of the failure of the said Gebbie to pay the balance due within five days, the said Guaranty Co. may proceed to sell the said books set forth in 'Exhibit C' (then remaining unsold) to the highest responsible bidder at either public or private sale and the proceeds of said sale, less the reasonable expenses thereof, shall be applied to the account of the said indebtedness and the balance, if any, after the payment of the said indebtedness, shall be paid to the said Gebbie by the said Guaranty Co., and the said Guaranty Co. shall within twenty days after the said sale, send a statement to the said Gebbie showing the condition of the accounts between the parties hereto; or at the option of the said Guaranty Co. it may allow this agreement to continue from month to month upon the conditions hereinbefore set forth having the right, within the first ten days of any month, to demand the balance then due and of proceeding to the sale of the said books set forth in 'Exhibit C' (then remaining unsold) same as is above provided.

"Seventh: It is further understood and agreed between the parties hereto that the terms of the agreement dated the 16th day of November, 1903, entered into between the predecessor of the said Gebbie, Gebbie and Company, a corporation of the state of New Jersey and The Merchants Guaranty Trust Co., are not modified or changed by this agreement, but nothing in the said agreement shall require the said Gebbie to pay more than $11,252.25 on account of the dealings of the parties hereto or their respective predecessors."

In my opinion, it cannot be properly inferred from this agreement that a sale was intended by the parties, or even an ordinary pledge as collateral security. No doubt an interest of some kind in the books described was intended to be given to the guaranty company, and perhaps such interest more nearly resembles a pledge than a sale; but if the agreement is read as a whole, its controlling object seems to be the grant to the guaranty company of a right in the proceeds of the books, while Gebbie & Co.'s right of property and of possession, and their right to sell at their own discretion, are left practically undisturbed. Even in form, the agreement (taken as a whole) is not a bill of sale. It is more like a chattel mortgage to secure the payment of $11,252.25, for it would certainly cease to be effective after the debt was paid; but, as a chattel mortgage of this discription is not sanctioned by the law of Pennsylvania, the result seems to be that the transaction must be treated as an attempt to pledge, but without the surrender of possession, and with an express provision that the pledgee shall not sell. The option given by article 6 to sell under certain conditions was not exercised until after the bankruptcy. The adjudication was entered on April 12, 1907, and the guaranty company made no attempt to offer the property for sale until about May 25th; and, of course, it was then too late to interfere with whatever rights the trustee had acquired under the bankruptcy law.

It does not seem to me that a prolonged discussion of the foregoing facts is necessary. The general rule with regard to one of the requisites of a pledge is as follows (22 Amer. & Eng. Ency. of Law [2d Ed.] 853, and cases in notes):

"To constitute a valid pledge, there must be an actual or symbolical delivery of possession of the thing pledged; and to preserve the pledge, as will be seen hereinafter, the pledgee must retain possession of the property. Ordinarily, the physical possession of the property is delivered to and retained by the pledgee."

· Or, to use the language of the note to Lucketts v. Townsend, 49 Am. Dec. 731:

"It is of the very essence of the contract that there should be a delivery or transfer of custody of the pledge to the pledgee, coupled with a continuous retention of possession by him. * * * What will amount to a sufficient delivery is often a nice question of law and fact. The general criterion is that the delivery should be as complete as the nature of the article bailed admits of. This does not require that the delivery should in all cases be manual. It may be either constructive or symbolic, if the pledgee is clothed with all the usual muniments of title and indicia of ownership. * * * "

To this general rule there are exceptions, which need not now be noticed. That there was neither actual nor symbolical delivery of possession, in the present case, seems to me beyond controversy. It is scarcely pretended that there was actual delivery—the facts are decisively against it—and the only ground upon which constructive or symbolical delivery can be urged is the fact that a lease for six months of the room in which the books were stored was executed to the guaranty company at the same time with the agreement. But this lease was a mere sham; the lessee had not even unrestricted access to the leased premises; the rent was neither demanded nor paid, nor intended to be paid; and the whole affair was simply a juggle on paper that cannot be treated seriously. It is perfectly clear that the bankrupt's possession of the books and of the premises where they were stored was never disturbed for a moment, and that all the indicia of ownership continued unchanged after January, 1905, until the petition in bankruptcy was filed. In such a situation the Pennsylvania law is well settled. Whether an agreement that seeks to transfer the title to personal property is to be construed as a formal sale or a formal pledge, it is in either case ineffective against execution creditors unless there is a visible change of possession. This is the general rule, and, so far as a formal pledge is concerned, it has been in force in this state since the decision in Welsh v. Bekey (1829) 1 Pen. & W. (Pa.) 57. And a similar rule prevails as to a formal sale without change of possession. Stephens v. Gifford, 137 Pa. 219, 20 Atl. 542, 21 Am. St. Rep. 868. It follows that, under the law of Pennsylvania, the books in question continued to be the property of the bankrupts, and that this property prior to the filing of the petition might have been levied upon and sold under judicial process against them. Therefore by section 70, cl. "a," the trustee was vested with a title thereto which is good against the guaranty company, whichever of its characters—formal vendee or formal pledgee —may be the more appropriate.

Collins' Appeal, 107 Pa. 591, '52 Am. Dec. 479, is not in conflict with this conclusion. The ground of that decision will appear by the following quotation from the syllabus:

"In general, however, it is essential that the instrument creating the pledge should make or provide for an unconditional assignment of the subject of the pledge to the pledgee; otherwise some further act of assignment by the pledgor is necessary.

"But a recognized exception to this rule is where, by the agreement of the parties, the possession of the subject of the pledge is to remain with the pledgor. In such case the pledgor and all persons claiming under him, except bona fide purchasers for value without notice of the pledge, are bound by the agreement.

"The principle of such exception has been applied to the pledge of specific chattels; a fortiori, it applies in the case of the pledge of an intangible interest, incapable of delivery or manual occupancy, or in the case of an expectancy to come into existence after the contract of pledge is made, and where the personal effort of the pledgor is necessary, both to its subsequent existence and its actual maintenance."

Accordingly, it was held in that case that the pledgee of an interest in a limited partnership, which was only in contemplation when the contract was made, could enforce the contract against a general creditor of the pledgor; but it is to be observed that the right of an execution creditor who had acquired a lien against the property was not involved, and also that the effect of the bankruptcy act could not be considered, as the case was decided 15 years before the act was passed.

As it seems to me, the superiority of the trustee's title is clear. In some cases he merely stands in the bankrupt's shoes, but his position here is different, because the bankruptcy act expressly gives him a better title, and therefore the doctrine of York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, does not apply. This is apparent from the decision of the Supreme Court in Security Warehousing Co. v. Hand, 206 U. S. 415, 422, 27 Sup. Ct. 720, 51 L. Ed. 1117. The facts of that case closely resemble the facts now under consideration, as will appear by the following quotation from Mr. Justice Peckham's statement on page 416 of 206 U. S., page 720 of 27 Sup. Ct. (51 L. Ed. 1117):

"From these findings it appeared that the Security Warehousing Company was a corporation of the state of New York, duly licensed to do business in the state of Wisconsin, and that it was engaged in the business of 'field warehousing,' so called; that it owned no warehouse of its own, and occupied no public warehouse at any place. The warehousing company leased certain premises from the (bankrupt) knitting company in Racine in the state of Wisconsin, and also certain premises at a place called 'Stevens Point' in the same state. These two places were occupied by the knitting company with their goods to be sold, and the goods were placed on the premises really occupied by the knitting company, although in form leased by it to the warehousing company, and the so-called warehouse receipts were given to the knitting company by the warehousing company, acknowledging the receipt of the property at such places. There was no change of the possession in fact, and scarcely any in form. These receipts were in turn pledged by the knitting company to various banks, and moneys obtained upon the security of such receipts from them."

Upon these facts the title of the trustee was upheld, not only against the warehousing company, but also against persons who had taken

the warehouse receipts in good faith and in due course of business as security for loans. The ground on which the trustee's title was declared to be good against the warehousing company is thus stated in the opinion, pages 425 and 426 of 206 U. S., page 724 of 27 Sup. Ct. (51 L. Ed. 1117):

"By section 70a the trustee in bankruptcy is vested by operation of law with the title of the bankrupt to all property transferred by him in fraud of his creditors, and to all property which prior to the filing of the petition might had been levied upon and sold by judicial process against him; and by subdivision 'e' of the same section the trustee in bankruptcy may avoid any transfer by the bankrupt of his property which any creditor of the bankrupt might avoid, and may recover the property so transferred or its value. Here are special provisions placing the title to the property transferred by fraud, or otherwise as mentioned, in the trustee in bankruptcy, and giving him the power to avoid the same.

"The title to this property was in the knitting company. There had been no valid pledge of it because the possession had been at all times in the knitting company, and it could have been levied upon and sold under judicial process against the knitting company at the time of the adjudication in bankruptcy. The security company had, of course, full knowledge that the knitting company, in fact at least, shared in the possession of the property. It was itself an actor, or it acquiesced in the arrangement under which it had, at most, but a partial possession, and even that was subject to the control of the knitting company."

These paragraphs are, I think, peculiarly applicable to the present situation, and render further comment unnecessary.

The decision of the referee is affirmed.