## In re MILLER PURE RYE DISTILLING CO.

(District Court, E. D. Pennsylvania. February 10, 1910.)

No. 3,021.

BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—PLEDGE OF DISTILLER'S BONDED WAREHOUSE CERTIFICATES.

A distilling company's warehouse certificates, calling for whisky stored in its bonded warehouse, which in practical effect under the internal revenue laws is in the custody of the United States as bailee, represent the property itself, and their transfer to a purchaser or pledgee operates as a delivery of the whisky called for thereby subject to the payment of the tax, and, when made in good faith more than four months prior to the company's bankruptcy, such a pledge is good as against its trustee and general creditors, and the whisky does not pass to the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of Miller Pure Rye Distilling Company, bankrupt. On certificate of referee. Order reversed.

Snyder & Zieber, for claimant.
Joseph Hill Brinton, for trustee.

J. B. McPHERSON, District Judge. This dispute presents an important and interesting question: What effect should be given to the pledge of a storage receipt covering packages of whisky in a distiller's bonded warehouse? The creditors' petition was filed on February 3, 1908, and if the whisky was property which the bankrupt could have transferred by any means before that date, or which might have been levied upon and sold under judicial process against the company, the trustee afterwards acquired the title that might thus have been transferred, or been levied upon and sold at judicial sale. If the pledge of the receipts pledged the whisky, the trustee's title is subordinate; otherwise, the adjudication gave him the complete ownership. The relevant facts are as follows:

On August 27, 1907, the Penn National Bank of Reading, Pa., lent $2,500 to the bankrupt, a corporation then engaged in distilling whisky at Ryeland or Womelsdorf; both names being used in the evidence. The company secured the loan by giving its note at four months, and also by pledging as collateral three warehouse receipts and certain gauger's certificates covering 200 barrels of whisky in the company's bonded warehouse. The note contains the usual collateral provisions. It states, inter alia, that the company has deposited with the bank as collateral security 200 barrels of whisky in the bonded warehouse at Womelsdorf as per warehouse receipts and gauger's certificates accompanying the note; and in the event of default at maturity authorizes the holder to sell, transfer, and deliver the whole or any part of the whisky without any previous demand, advertisement, or notice, either at public or private sale, with the right on his part to buy the property free of all trusts and claims. A copy of one of the receipts, duly indorsed by the company, is as follows:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

No. 5,454.          First District of Pennsylvania.          25 Bbls.
United States Internal Revenue Distillery Bonded Warehouse of Miller Pure
Rye Distilling Company.

Ryeland, Berks Co., Pa., August 26, 1907.

Received on storage from ourselves twenty-five (25) barrels of Miller Pure
Rye Whisky Distilled, marked and numbered as per record attached, subject
to our order and risk of loss or damage by fire, the elements, leakage, evap-
oration or accident. Deliverable only upon surrender of this certificate, pay-
ment of tax and other charges due thereon, and storage at the rate of five
cents per barrel per month, from August 26th, 1907. Inspection Spring 1907.
Stored in Warehouse No. 2.          Miller Pure Rye Distilling Co.,
Serial Nos. of Packages 7964/7988.          S. V. Nagle, President.

Special Notice.—Particular care should be taken of this certificate as the
whisky cannot be delivered without its surrender.

The gauger's certificates accompanied the receipts, and are dated be-
tween April 23 and June 7, 1907. The note was not paid at maturity,
and on February 5, 1908, the bank, after advertisement and notice to
the company or its representative, sold the receipts at public sale and
bought them in for $200. Thereafter the bank offered to pay all taxes
and charges, and asked the referee for an order, directing the trustee
to take whatever steps might be required under the internal revenue
laws to bring about the physical delivery of the whisky to the bank.
In reply the trustee denied that the bank had become the owner,
averred that no delivery had ever been made, and asserted that the
whisky was under the company's exclusive control and direction when
the receipts were executed and pledged. Numerous other claims of a
similar kind were presented to the referee, and much testimony was
taken. By agreement all the evidence applies to all the claims, and I
understand also that they will all be disposed of by the decision in the
case now under discussion. The referee refused the order, holding
that the trustee as the representative of the general creditors could
successfully attack the pledge of the receipts; the ground of the de-
cision being that the whisky itself had not been validly pledged, be-
cause it had not been delivered either actually or constructively. The
company continued therefore to be the owner, and the trustee suc-
ceeded to its title.

As already stated, the bank bought in the receipts on February 5th,
and thus became their formal owner; but the sale was held two days
after the petition in bankruptcy was filed and can have no effect upon
the pending question. If the bankrupt could have transferred the
whisky on February 3d, or if a creditor could then have sold it under
judicial process, the title passed to the trustee when the adjudication
was afterwards entered. For present purposes the sale on February
5th is not material. If the pledge of the receipts bound the property,
the bank's petition should have been allowed; if failure to deliver the
whisky made the pledge invalid, the subsequent sale could not give it
life. What effect, then, did the issue and pledge of the receipts have
upon the rights of general creditors? There is no doubt that the
pledge was for value and was without fraud in fact, and that it was
made more than four months before the petition in bankruptcy was
filed. But these considerations are not decisive; if the pledge was
fraudulent in law because the whisky was not delivered, either actually

or constructively, the bank acquired no rights against general creditors, and has no valid claim upon the property.

Save in one respect, the case cannot be distinguished, I think, from In re Millbourne Mills Co. (C. C. A.) 172 Fed. 177; and, unless the distinction justifies the application of a different rule, the order of the referee was right. In my opinion, however, a material difference between that case and this is to be found in the fact that the pledged property here was stored in a bonded warehouse established and maintained under the laws of the United States. It is true that the whisky did not cease to belong to the company, simply because it was stored in the warehouse. It was the product of the bankrupt's skill, labor, and capital, and in no sense belonged to the government. The stringent regulations of the federal law concerning the custody of distilled spirits are intended to protect the government's right to the tax. They have no other ultimate purpose; but I think it cannot be denied that these regulations interfere so seriously with the owner's right to deal freely with the spirits that property in such a situation should not be treated as grain and flour, for example, are treated in the warehouse of a milling company. In the case of a milling company, nothing except the convenience or the desire of the parties prevents the company from delivering possession of the grain or flour to the pledgee; and therefore, if they choose to make a contract of pledge without actual or constructive delivery of the property, they must abide the consequences. But delivery of spirits in a bonded warehouse cannot be offered by a pledgor nor accepted by the pledgee. The spirits must remain where they are until the tax is paid and the government formally permits the removal. The peculiar situation in which the federal law has placed this kind of property will appear more fully in a moment; but I may anticipate the reference to the statutes in order to say at once that in my opinion the rule now applicable is not the general rule that is so fully discussed in Re Millbourne Mills Co. (C. C. A.) 172 Fed. 177, but the well-known exception that seems to have been announced for the first time in Pennsylvania in Linton v. Butz, 7 Pa. 89, 47 Am. Dec. 501. In that case a machine was sold while it was in the hands of a third person as bailee, and the vendee did not disturb the possession. It was afterwards levied on and sold as the property of the vendor; but the vendee recovered its value in an action of trespass against the execution creditor, the court saying:

"* * * (To) constitute a valid assignment of personal property against an execution, there must be a delivery accompanied and followed by a continuing possession in the assignee. And where the possession does not follow as well as accompany a transfer, it is a fraud in law, without regard to the intent of the parties. It is not sufficient that the assignor gives to the assignee a delivery which may be symbolical or constructive, or a temporary delivery, and then takes the articles back into his own possession, and keeps and uses them as before. The case in hand differs in two particulars from the cases cited. Here, at the sale, the articles sold was not in the possession of the vendor, but in the hands of another, as bailee; and the vendor did not take it again into his own possession. Hence the property being in the hands of the bailee, the only possession was given of which it was susceptible. This is all that is required. Thus nothing is more common than a transfer by a principal of goods in the hands of a factor, and no one doubts it is a valid transfer, subject only to any lien which the factor may possess. So a transfer of goods at

sea, which are in the possession of the master of a ship, is deemed a valid transfer, and if he refuse to deliver them, upon due demand and refusal, the vendee may maintain suit against him for the recovery of them or their value. In a case of bailment the property passes when the sale is completed, and no formal delivery is necessary."

Other decisions recognizing Linton v. Butz are Worman v. Kramer, 73 Pa. 385, Woods v. Hull, *81 Pa. (32 Smith) 453, Stephens v. Gifford, 137 Pa. 232, 20 Atl. 542, 21 Am. St. Rep. 868, and Caulfield v. Van Brunt, 173 Pa. 433, 34 Atl. 230. It is true that the government was not a formal and technical bailee of the whisky, but its possession and control were of such a character as not to be distinguishable in effect from possession and control under a bailment. Whisky in a bonded warehouse is in a peculiar situation. Usually, the title is in the distiller, and it is also true that for certain purposes he may be said to have some degree of possession, custody, or control. At all events, he comes within the terms of a statute which subjects spirits to forfeiture if they be found in "the possession or custody or within the control of any person or persons for the purpose of being sold or removed by such person or persons in fraud of the internal revenue laws, or with design to avoid the payment of such taxes." United States v. 36 Barrels of High Wines, Fed. Cas. No. 16,468, 7 Blatchf. 459. But the subject must now be approached from a different point of view. How are the general creditors of a distiller affected by the situation and surroundings of spirits belonging to him and stored in his bonded warehouse? Does the distiller appear to be the owner? Has he such apparent possession as indicates the power to dispose of the property freely? Does he obtain a false credit by seeming to have the sole right to sell or pledge? As creditors are bound to take notice of the federal statutes governing a bonded warehouse, let us look at the provisions that are now relevant.

A distiller is required to provide at his own expense a warehouse in which nothing but spirits may be stored. The warehouse must have no doors or windows leading into the distillery or into any other room or building, and must be under the direction and control of the collector of the district, and in immediate charge of a storekeeper who is assigned to this duty by the Commissioner of Internal Revenue. In this warehouse the spirits may remain for eight years, but they may be withdrawn at any time during that period. 2 U. S. Comp. St. 1901, p. 2122. If the commissioner thinks the warehouse unsafe or unfit for use, he may require the distiller to provide another and to remove the spirits at his own expense. Id. 2123. The warehouse is theoretically in the joint custody of the storekeeper and the proprietor, but in fact the control of the storekeeper is complete and practically exclusive. The lock is put on by the government, and the key is in the storekeeper's possession. The warehouse must not be unlocked or opened or remain open except in the presence of the storekeeper or his lawfully designated representative, and no articles may be received or taken out except by the collector's order addressed to the storekeeper. Id. 2124. Any revenue officer at any hour of the day or night may enter the building to examine, gauge, measure, and take account of the spirits. Heavy penalties are denounced if his attempt to enter is obstructed by

the distiller. Id. 2125. Immediately upon distillation, the spirits must be placed in the warehouse. Careful regulations provide what kind of packages may be used, and regulate their brands and stamps. Id. 2130, 2132. A formal entry that the spirits have been deposited in the warehouse must be made with the collector, the storekeeper, and the commissioner, and a bond for the payment of the tax must accompany the entry. Id. 2133. Immediately after the tax has been paid, the spirits must be removed under penalty of forfeiture. Id. 2132. This removal is carefully guarded, and can only take place on the collector's order. Id. 2135, 2136. There are heavy penalties for removing spirits from the warehouse except as provided by law, and these penalties may be inflicted although no intent to defraud may exist. Id. 2136.

There are other provisions applicable to a distiller's warehouse, but these will suffice, I think, to show that in no proper sense can a distiller be said to "make a warehouse of himself as to his own goods"—to use the language of the Millbourne Mills Case. He has no choice in the matter; he must provide the place of storage, must surrender control to the government's officers, and must forego the right even to enter his own building except by permission and in the presence of the storekeeper. Moreover, he may not keep the spirits in the warehouse as long as he pleases. He must give bond for the payment of the tax; but even after the tax is paid he does not thereby regain control over the spirits, so that he may keep them where they are, for as soon as the tax is paid, whether by the distiller himself or by the purchaser, they must be removed from the warehouse or be subject to forfeiture. To treat property stored under these restrictions as if it were freely at the disposal of the owner is, I think, out of the question. If the owner of flour or grain chooses to sell or pledge it, no external power prevents him from making delivery; and if delivery, either actual or constructive, is not made, the public may well conclude that the ownership still accompanies the possession. But here is a species of property over which the legal owner has almost no control. As soon as he makes it, he must put it into a warehouse in the charge of a government officer. After that time he cannot even see it except by permission, and apparently he cannot mark the packages except as the law prescribes. He is liable for the tax upon it; but he cannot go on storing it after he pays the tax, but must remove it without delay. The public, therefore, who only see the outside of a bonded warehouse, but are nevertheless chargeable with knowledge of the federal statutes, cannot be misled by the continued presence of the spirits. The government's complete control is well known, and the fact that the spirits remain in the warehouse is equally consistent with the distiller's title as owner, or with the title of a buyer or pledgee. Neither buyer nor pledgee can take delivery without paying the tax, and neither is bound to make payment until actual removal is desired. At no time can it be said that the spirits are in the exclusive possession of the bankrupt. Every step even of the manufacturing process is carefully supervised by the government, and the bankrupt is never able to deliver possession of the product to a third person without violating the law. Id. 2120, 2121.

To the public, therefore, including its general creditors, a distilling company is never able to assume such appearance of prosperity as the possession of personal property ordinarily gives. Indeed, the public are excluded from the warehouse, and the quantity of spirits that are stored therein can only be a matter of conjecture. But even if the quantity should be actually known there would be little advantage in such knowledge, for the government's hand is upon it all, whether the packages are many or few. It is so completely in the government's actual control and possession that it cannot be levied upon by judicial process in the hands of a sheriff. This was decided in McCullough v. Large (C. C.) 20 Fed. 309, by Mr. Justice Bradley and Judge Acheson, who held that whisky deposited in a bonded warehouse of the United States, and held therein for internal revenue taxes due the government, is virtually in the possession of the United States, and that a sheriff has no right to enter the warehouse and levy upon the whisky as the property of the defendant, even though the sheriff may offer to pay the tax.

But how then is this property to be dealt in? Is the owner to be debarred from deriving any benefit from it unless he can find a buyer or creditor who is ready to take immediate possession? It is well known that spirits would lose much of their value, if they could only be sold under such a restriction, and it is therefore not surprising to find that the natural expedient has been adopted of substituting warehouse certificates or storage receipts in place of the whisky itself. As the government is in effect a bailee, the situation is practically the same as in the case of ordinary articles deposited in a storage warehouse of the usual character. In such event the storage receipts may be freely sold or pledged, and there seems to be no good reason why similar receipts for bonded spirits should not have the same position in the markets of the country. In fact, they do have this position now, unless the courts shall refuse to recognize it; for it is the unbroken custom of the trade—the evidence leaves no doubt upon this point—to treat storage receipts for spirits as completely equivalent to the spirits themselves, and to sell or pledge them freely and without question.

In the present case there are many claimants against the spirits in the bankrupt's warehouse; some putting the claim upon a pledge, most of them upon a sale, and the transactions extending over the period from March, 1903, to the end of 1907. They would be greatly astonished, I think, to be advised that transactions three or four years old, carried out according to a well-known and universally established custom, were voidable at the option of the trustee in bankruptcy because the property sold or pledged had not been physically delivered when the sale or pledge took place. And the soundness of the reason supporting such a result would be more difficult to appreciate, if such claimants were also told that their receipts were not valid because the spirits had been placed in the distiller's own warehouse, but would have been valid if the spirits had been placed in a general bonded warehouse, although in all other respects there would have been no difference between the two places of deposit. General warehouses not connected with a distillery may be established and spirits may be stored

therein. 2 U. S. Comp. St. 1901, p. 2143 et seq. The regulations and restrictions of the internal revenue laws apply to these places of storage just as they apply to a distiller's own warehouse; but in the case of a general bonded warehouse there can be no doubt that the proprietor is a bailee, and that physical delivery of property in his warehouse is not necessary in order to validate a sale or a pledge. It would be difficult, I think, to justify the conclusion that delivery of storage receipts would deliver the spirits in the one case, but would not deliver them in the other, since the conditions are essentially the same in both, and give equally effective, or ineffective, notice to the public.

It is, of course, true that unless a buyer or pledgee of storage receipts takes certain precautions—for example, gives notice to the government officials, assuming such notice to be sufficient—he may be defrauded by a second sale or a second pledge of the same property. This happened in Miller v. Browarsky, 130 Pa. 372, 18 Atl. 643. But the possibility of such a fraud has no bearing upon the question now under consideration. There is no dispute at present between two persons, both of whom are innocent purchasers or pledgees; the question now being this: Whether any innocent purchaser or pledgee of a bonded warehouse receipt can get a good title to the whisky without taking actual possession.

The decision of the referee is therefore reversed, and he is directed to make an appropriate order under which the bank may be put into possession of the whisky in dispute.