## TANEY v. PENN NAT. BANK OF READING.

### BOARTS v. J. M. SELDEN & CO.

(Circuit Court of Appeals, Third Circuit.   June 19, 1911.)

Nos. 5 (1,355), 54 (1,423).

1. FRAUDULENT CONVEYANCES (§ 148*)—PERSONAL PROPERTY—RETENTION OF POSSESSION BY SELLER—LAW OF PENNSYLVANIA.

By the law of Pennsylvania, as established by the decisions of its Supreme Court. retention of possession by the vendor of personal property sold or otherwise transferred is fraudulent in law whenever the subject of the transfer is capable of delivery, and no honest and fair reason beyond the convenience of the parties can be assigned for the vendor not giving up, and the purchaser taking, possession.   But fraud is not imputed where the subject of the sale is not reasonably capable of actual delivery, or where delivery is made in accordance with the usages of the trade or business in which the sale was made.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 548, 549; Dec. Dig. § 148.*]

2. BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—WHISKY IN DISTILLERY WAREHOUSE—TRANSFER OF WAREHOUSE RECEIPTS.

A distilling company's warehouse receipts, calling for whisky stored in its distillery warehouse. which is in practical effect, under the internal revenue laws, in the custody of the United States, and incapable of delivery by the distiller without payment of the tax, represent the property itself, and their transfer to a purchaser or pledgee in good faith, together with the gauger's certificates, in accordance with the usages of the business. under the law of Pennsylvania operates as a delivery of the whisky, and, if made more than four months prior to the bankruptcy of the distiller, the sale or pledge is valid as against its trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

INTERNAL REVENUE (§ 24*)—WAREHOUSE RECEIPTS—TRANSFER—DISTILLERY.

The relation between a distiller and the officers of the government in custody of the whisky in his distillery warehouse is sui generis.   It is prescribed by law, and is not contractual, and warehouse receipts issued by the distiller for whisky so stored in bond are not within Act Pa. Sept. 24, 1866 (1 Purd. Dig. [13th Ed.] p. 395). providing for the negotiability of warehouse receipts, which receipts, under the decisions of the Supreme Court of the state. must have been issued by a third and independent person, in order that their transfer by the bailor to a purchaser or pledgee shall operate as a delivery of the property.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 68–71; Dec. Dig. § 24.*]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

In the matter of the Miller Pure Rye Distilling Company, bankrupt.   From an order (176 Fed. 606) adjudging the Penn National Bank of Reading to be the owner of certain property, Joseph A. Taney, trustee, appeals.   Affirmed.

Joseph Hill Brinton, for appellant.

A. Leo Weil, Alexander Simpson, Jr., and Lawrence Maxwell, for appellee.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

187 F.—44

Appeal from the District Court of the United States for the Western District of ·Pennsylvania.

In the matter of the Foxtown Distilling Company, bankrupt. From an order adjudging J. M. Selden & Co. to be the owners of certain property, Isaac N. Boarts, trustee, appeals. Affirmed.

H. H. Fisher, for appellant.

A. Leo Weil, Alexander Simpson, Jr., and Lawrence Maxwell, for appellee.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

GRAY, Circuit Judge. These cases come before us on a rehearing. The first of them was originally argued at the March term, 1910, and the latter at the October term, 1910, both being appeals from decrees of the District Courts for the Eastern and Western Districts of Pennsylvania, respectively, sitting in bankruptcy. As the determining question was the same in both cases, they were argued together at the rehearing, and will now be considered together.

As to the first case, the facts are briefly summarized from the record and the opinion, of the court below, as follows: On August 27, 1907, the Penn National Bank of Reading, Pa., loaned $2,500 to the Miller Pure Rye Distilling Company, for which it made its note to the Bank, payable four months after date, it being stated in said note that there was deposited with the said Bank, as collateral security, "the following property, to wit, 200 barrels of whisky in the bonded warehouse of the Distilling Company at Womelsdorf, Pa., as per warehouse receipts, gauger's certificate, etc., accompanying." This bonded warehouse was erected by the Distilling Company upon its own premises, pursuant to the requirements of the revenue laws of the United States, and was under the control, as hereinafter stated, of the Collector of Internal Revenue for the district.

There was no actual delivery of the whisky, or of any part of it. The note was not paid at maturity, and on February 5, 1908, the Bank, after due notice, exposed to public sale the warehouse certificates for said 200 barrels of whisky, deposited as collateral for said note, and became the purchaser thereof, and claimed, by virtue of said sale, to have become the absolute owner and holder of the said 200 barrels of whisky embraced in said certificates. On February 3, 1908, the creditors' petition in bankruptcy was filed against the said Distilling Company. On February 19, 1908, the said company was adjudicated a bankrupt, and on March 24, 1908, the appellant, Joseph A. Taney, was duly appointed trustee in bankruptcy. Thereafter, the Bank, by its petition, offered to pay all taxes and charges, and asked the referee in bankruptcy for an order, directing the trustee to take whatever steps might be required under the internal revenue laws to bring about the physical delivery of the whisky to the Bank. In reply, the trustee denied that the Bank ·had become the owner, and averred that no delivery had ever been made, asserting that the whisky was under the Distilling Company's exclusive control and protection when the receipts were executed and pledged. The referee

refused the order, holding that the trustee, as the representative of the general creditors, could successfully attack the pledge of the receipts, taking the ground that the whisky itself had not been validly pledged, because it had not been delivered either actually or constructively; that the company, therefore, continued to be the owner, and that the trustee succeeded to its title. A copy of one of the so-called warehouse receipts, duly indorsed by the Distilling Company to the Penn National Bank of Reading, is as follows:

No. 5454.        First District of Pennsylvania.        **25 Bbls.**

United States Internal Revenue Distillery Bonded Warehouse of Miller Pure Rye Distilling Company.

Ryeland, Berks Co., Pa., August 26, 1907.

Received on storage from ourselves twenty-five (25) barrels of Miller Pure Rye Whisky Distilled, marked and numbered as per record attached subject to our order and risk of loss or damage by fire, the elements, leakage, evaporation or accident. Deliverable only upon surrender of this certificate, payment of tax and other charges due thereon, and storage at the rate of five cents per barrel per month, from August 26, 1907. Inspection Spring, 1907.

Stored in Warehouse No. 2. Miller Pure Rye Distilling Co., Serial Nos. of Packages, 7964/7988.        S. V. Nagle, President.

Special Notice.—Particular care should be taken of this certificate as the whisky cannot be delivered without its surrender.

The gauger's certificates accompanied the receipts and bore dates between April 23 and June 7, 1907. Exceptions being filed on behalf of the Bank to the referee's report, the learned judge of the court below, in a well-considered opinion (reported in [D. C.] 176 Fed. 606), reversed the order of the referee, and directed him to make an appropriate order, under which the Bank might be put into possession of the whisky in dispute.

As to the second case, the material facts, collected from the report of the special master and the record before us, are as follows: The Foxtown Distilling Company was a partnership owning and operating a distillery at the village of Foxtown, in Westmoreland county, Pa. For several years prior to the commencement of bankruptcy proceedings, it was engaged in the manufacture and sale of whisky. On the distillery premises of said company, and constituting a part of it, there was erected, as in the former case, pursuant to the revenue laws of the United States, a bonded distillery warehouse, under the control of the Collector of Internal Revenue for the district. In this warehouse, the whisky claimed by the appellee was entered, with other whisky, by the Distilling Company, and received, gauged, inspected and marked by a United States gauger, who issued gauger certificates therefor to the Distilling Company.

It is not disputed that, by a transaction purporting to be one of purchase and sale, the Distilling Company sold and the appellee bought and paid for in full 410 barrels of the whisky thus stored, between the 15th day of May, 1908, and the 12th day of February, 1909, the Distilling Company delivering to the appellee vouchers or receipts therefor, with the gauger's certificates attached thereto. The general form of these so-called warehouse receipts, was the same in this

as in the former case, and as in the trade generally. For want of a better name, we will refer to them hereafter as whisky certificates or vouchers. A copy of one of them is as follows:

| Serial Nos. | Wine Gal. | Proof P. F. Gal. | Date Inspection. | Withdrawn. |
|---|---|---|---|---|
| 1265 | 4419 | 100 | Feb. 5, 09 | |
| 1266 | 4573 | " | " " " | |
| 1267 | 4727 | " | " 9 " | |
| 1268 | 4445 | " | " " " | |
| 1269 | 4619 | " | | |

Total  22783

Gauged by A. C. Barnhart, U. S. Gauger, 23 District.

No. ——.                                                                            5.

United States Internal Revenue, Bonded Warehouse of Foxtown Distilling Co. No. 27, 23rd District Pa.

Youngwood, Pa., February, 1909.

This certifies that I have in this Distillery Warehouse Five Barrels of ———Whiskey branded

Foxtown Rye Whiskey.

Serial Nos. 1265–1269 inclusive and to be delivered to J. M. Selden Co. or order, on return of this Warehouse Receipt and the payment of tax and charges due thereon. Storage on said whiskey from Feb. 12—09 at 5 cents per barrel per month. Loss or damage by fire, the elements, leakage, evaporation or unavoidable accident at owner's risk. Outage guaranteed not to exceed the tariff bill of 1894.

No allowance after 7 years.

Stored in Warehouse No. ——— Foxtown Dist. Co. B.

L. N. Johnson, Prop.

[Indorsed:]  J. M. Selden Co.,
                   J. M. Selden, Treas.

On June 15, 1909, a voluntary petition in bankruptcy was presented by the partners constituting the Foxtown Distilling Company, upon which petition, on the same day, the said petitioners were adjudged bankrupts, individually and as a partnership, and an order made referring the case to the referee for further proceedings. Also, on the same day, the appellant, Boarts, was appointed receiver of the bankrupt's estate. On July 21st, upon the petition of the appellee, Selden & Co., a rule was granted on the receiver to show cause why he should not deliver to the petitioner the whiskies claimed by them under the purchase and sale hereinbefore recited. The rule was referred to the referee, as special master, to take testimony and make report, and on March 28, 1910, the referee reported recommending that the rule be made absolute, and that the whisky stored in the warehouse be delivered to the appellees, as the proper owner thereof, upon payment of all taxes and storage charges due thereon. This report was confirmed nisi, April 1, 1910, by the court below, and afterwards became absolute.

The facts stated in these appeals present, in the first case, the question whether the transaction between the Miller Distilling Company and the Bank was a valid and binding pledge of the whisky in bond as against the trustee in bankruptcy of the Miller Distilling Company, and, in the second case, whether the transaction between the Foxtown Distilling Company and Selden & Co., the claimant of the

whisky, was a valid and binding sale against the trustee in bankruptcy of the Foxtown Distilling Company. It should be premised that the records disclose that the pledge in the one case and the sale in the other were for value, and without fraud in fact, and were both made more than four months before the petition in bankruptcy was filed. Assuming that it is not material that the Bank, in asserting its right as pledgee, became the owner of the articles pledged two days after the petition in bankruptcy was filed, it is not controverted that the principles applicable in both cases are the same, and are those established by the law of Pennsylvania, as to sales of personal property.

[1] It is interesting, if not important, to observe that the laws in most, if not all, of our states, which make delivery of possession, actual or symbolical, necessary to a valid sale as against creditors of the vendor, and subsequent purchasers from him, may be referred to the substance or policy of the statute of 13 Elizabeth, c. 5, and to the development of the policy of that statute in the decisions of the English courts. It was a statute intended—

"for the avoiding and abolishing of feigned, covinous, and fraudulent feoffments, gifts, grants, alienations as well of lands and tenements as of goods and chattels devised and contrived of malice, fraud, covin, collusion or guile, to the end, purpose and intent to delay, hinder or defraud creditors."

The alienations which it denounced as illegal, are those which are feigned and covinous and devised to the end, purpose and intent to delay, hinder and defraud creditors. That the statute referred to actual fraud, is pointed out by Lord Mansfield in Cadogan v. Kennett, Cowp. 432. He is quoted in Benjamin on Sales, as saying that—

"the principles and rules of the common law, as now universally known and understood, are so strong against fraud in every shape, that the common law would have attained every end proposed by the statutes 13 Eliz. c. 5, and 27 Eliz. c. 4."

And he adds:

"These statutes cannot receive too liberal a construction, or be too much extended in suppression of fraud."

Benjamin says, the question of fraud is treated by the English authorities as a question of fact for the jury, even where the vendor remains in possession, although he had previously stated that the decision of Buller, J., in Edwards v. Harben, 2 T. R. 587, "that if there be nothing but the absolute conveyance without the possession, that, in point of law, is fraudulent," has never been overruled, and that it may be assumed that the law would be held to be the same at the present time. The learned author concludes that the English authorities—

"sufficiently establish the proposition that the continued possession by the vendor of goods sold, is a fact to be considered by the jury as evidence of fraud, and is not in law a fraud per se."

The annotator to this learned author has grouped the decisions in a large number of states, as having adopted the English rule in this respect, and the decisions from a smaller group of states, in which

Pennsylvania is included, as having adopted the rule in Edwards v. Harben:

"That if there be nothing but the absolute conveyance without the possession, that, in point of law, is fraudulent."

The significance, however, of the foregoing reference to the origin and growth of the law as to sales of personal chattels in England and in this country, is that, whether retention of possession by the vendor be evidence of fraud in fact, to be submitted to the jury, or fraud in law, it is in both cases the bald, naked, and unexplained possession of the vendor that is meant. Even a bona fide retention of possession by a vendor tends to the promotion of fraud, where the natural accompaniment of a bona fide sale would be a change of physical possession from the vendor to the vendee. The policy of the law, as it has developed in England and in this country since the statute of 13 Elizabeth, founded upon practical experience of human affairs, is embodied in the proposition that the mere retention of a physical possession, which is the ordinary accompaniment and indicium of ownership, and which the vendor can transfer to the vendee, is either prima facie evidence of fraud, or fraud per se. The very statement of this rule, however, implies the qualifications that may be imposed upon it by the varying circumstances of particular cases. In Pennsylvania, where this rule is undoubtedly established, many such qualifications have been recognized. Such cases are, for the most part, outside the rule as above stated, rather than qualifications of or exceptions thereto.

Mr. Justice Gibson, speaking for the Supreme Court of Pennsylvania, in Clow v. Woods, 5 Serg. & R. 277, 9 Am. Dec. 346, said:

"The Stat. 13 Eliz. does not, in words, declare a conveyance of goods fraudulent, where the vendor retains possession; but in general terms renders void all conveyances made to the end, purpose and intent of defrauding creditors. Hence, it becomes incumbent on the courts to determine, from all the circumstances of the case, whether the conveyance be or be not made with a fraudulent intention; and in judging of that, it is held, that any neglect in leaving the vendor in possession, is fraudulent within the statute. The general rule is, that the possession must be transferred to the purchaser; and to this, I propose to examine such exceptions as have been urged."

After discussing, without approval, some alleged exceptions to the rule, he says:

"It is necessary, not only that appearances should agree with the real state of things, but also, that the real state of things should be honest and consistent with public policy, and that it afford no unnecessary facility to deception. * * * But I take it, where the motive of the sale is merely security to the vendee, and the owner is permitted to retain all the visible marks of ownership, for no other reason than the convenience of the parties, the contract will be void, although the reasons for the arrangement be inserted, and the possession be consistent with the deed. * * * The inclination of my mind is to give the statute a liberal, perhaps an enlarged construction, by putting the rule, requiring a change of possession, on grounds of public policy, and confining its exceptions to those cases, where, in the very nature of the transaction, possession either could not be delivered at all, or, at least, without defeating fair and honest objects, intended to be effected by and which constituted the motive for entering into the contract. Where possession has been withheld pursuant to the terms of the agreement, some good reason for the arrangement beyond the convenience of the parties should appear."

In McKibbin v. Martin, 64 Pa. 352, 3 Am. Rep. 588, Mr. Justice Sharswood, speaking for the Supreme Court of Pennsylvania, refers to the case of Clow v. Woods, supra, as the—

"Magna Charta of our law upon this subject. The principles settled in that case have been recognized and affirmed by a bead roll of subsequent decisions which it would be a mere affectation of learning to cite. Without adverting to other points, it established that retention of possession was fraud in law, wherever the subject of the transfer was capable of delivery and no honest and fair reason could be assigned for the vendor not giving up and the vendee taking possession."

He quotes Chief Justice Gibson, as follows:

"As remarked by an eloquent writer, these statutes of Elizabeth produce the most beneficial effects, by placing parties under a disability to commit fraud, in requiring for the characteristics of an honest act such circumstances as none but an honest intention can assume; and they seem to have been expressed in general terms purposely to leave room for a large interpretation by the judges who, in accordance with the spirit rather than the words, have engrafted on them such artificial presumptions and legal intendments as are ordinarily subjects of judicial construction."

The learned judge afterwards cites, by way of illustration, cases in which the law has been interpreted in accordance with its real meaning, and says:

"But it often happens that the subject of the sale is not reasonably capable of an actual delivery, and then a constructive delivery will be sufficient. As in the case of a vessel at sea, of goods in a warehouse, of a kiln of bricks, of a pile of squared timber in the woods, of goods in the possession of a factor or bailee, of a raft of lumber, of articles in the process of manufacture, where it would be not indeed impossible, but injurious and unusual to remove the property from where it happens to be at the time of the transfer."

The spirit of these admirable statements as to the law governing sales of personal chattels in Pennsylvania has not been departed from in subsequent decisions of the Supreme Court, but they have been applied with intelligent recognition of their philosophy to the changed conditions of business, brought about by increasing population, wealth and commercial activity. In Crawford v. Davis, 99 Pa. 576, Mr. Justice Mercur uses this language:

"The general rule is, that the sale of personal property is not good against the creditors of the vendor, unless possession be delivered by the vendor in accordance with the sale. In determining the kind of possession necessary to be given, regard must be had, not only to the character of the property, but also to the nature of the transaction, the position of the parties, and the intended use of the property. No such change of possession as will defeat the fair and honest object of the parties, is required."

This language is repeated in the case of Pressel v. Bice, 142 Pa. 263, 21 Atl. 813, and the substance thereof in many other cases. In a late case, Barlow v. Fox, 203 Pa. 114, 52 Atl. 57, the Supreme Court said:

"When by the action of the parties there has been a separation of the title and possession of personal property, courts will scrutinize the transaction to determine the real intention, and but little regard will be given to the form which it has taken or the name by which it is called. The law is liberal in not requiring an actual change of possession when it will defeat the lawful purpose of the parties."

In Stephens v. Gifford, 137 Pa. 219, 20 Atl. 542, 21 Am. St. Rep. 868, the Supreme Court said, what is especially noticeable in its application to the present case:

"* * * The duty of the purchaser was affected by the nature of the transaction, and that a delivery in accordance with the usages of the trade or business in which the sale was made, was a sufficient delivery."

And in the very recent case of White v. Gunn, 205 Pa. 229, 54 Atl. 901, Mr. Justice Brown has, with great clearness and full apprehension of the spirit of the law in this regard, said:

"What, however, would be a sufficient delivery of possession and retention of it in one case might not be in another; and in saying that the rigor of the rule requiring the purchaser to take and keep possession of property purchased by him has been relaxed, nothing more was meant than that the law does not have or set up an unbending test of the sufficiency of delivery and retention of possession to be applied to all cases, but that, in passing upon the sufficiency of possession taken by the purchaser in any particular case, there must be taken into consideration the character of the property, the use to be made of it, the nature and object of the transaction, the position of the parties and the usages of the trade or business."

There are many other cases which it would be a work of supererogation to cite. It suffices to say that the law of Pennsylvania in respect of the question we are now considering, is settled by a line of cases extending through nearly a century. Starting with the policy of the statute of Elizabeth, for the circumvention of fraud and deceit in sales of personal property (which nowhere in terms refers to retention of possession by a vendor), it has wisely developed the spirit of that statute and evolved the salutary rule, that where there is nothing in the case but the retention of a physical possession by the vendor, which he is capable of delivering to the vendee, such retention is fraud per se, and not merely evidence of fraud, even though there be nothing inconsistent with the most perfect honesty. But this rule is not applied by the courts of Pennsylvania to cases where the inherent nature of the transaction and the attendant circumstances are such as to preclude the possibility of a delivery by the vendor, that would be consistent with the avowed and fair purpose of the sale, or where the absence of a physical delivery is excused by the usages of the trade or business in which the sale was made. These exceptions (as they are sometimes called) to the rule, of not divorcing possession from title to personal property, are generally recognized by the courts both in this country and in England; and in Pennsylvania, the line of demarcation between the cases which do or do not fall within the rule, has been laid down by the courts with singular clearness and precision.

[2] Tested, then, by the law of Pennsylvania, as we have stated it, what is the legal character of the transactions presented by the cases with which we are here concerned? The following facts seem to be clearly established by the records before us:

The whisky was not so in the physical possession of the Distilling Company, as to render possible a delivery at the time that the pledge was made in the one case and the sale in the other, consistent with the avowed and fair purpose of the transaction. The facts in sup-

port of this proposition must be examined with some care, as the contrary has been contended with much force and ability.

The excise tax on whisky is one of the most fruitful sources of revenue possessed by the federal government, and the internal revenue laws and the treasury regulations made in pursuance thereof, provide for and safeguard its collection with the most scrutinizing care and particularity. It is well known that a marketable product is not the result of mere distillation of the liquor from grain or fruit. In fact, its change into such a product may be said to be hardly begun when it makes its appearance in the tank or cooling vats. It requires to be skillfully cared for and ripened, and for the ripening process it is necessary that the whisky should be stored in wood for several years. The tax on whisky is remarkable and distinguished from other excise taxes, by the fact that it is in amount many times the cost of the whisky itself, the tax of $1.25 a gallon being about five times the ordinary value of the whisky at the still. It is manifest that this extraordinary tax could not be collected on the whisky as it comes from the still, or when it is first put in barrels, without hardship to the distiller or owner so great as to discourage its manufacture or confine such manufacture to persons or corporations of great wealth. It was necessary, or at least very desirable in the interest of the public revenue, that reasonable opportunity should be given to the distiller, to allow the product of his distillery to become marketable by the ripening process alluded to, before he was called upon to pay the tax. As this involved quite a number of years, the government, for the convenience of the distiller, as well as for the protection of its own revenue, has provided by law for the custody and control of the whisky from the time it leaves the still until, being properly aged, it has become marketable, or until it is convenient for the distiller or owner to pay the tax thereon and withdraw the same from such custody. Where the amount of the tax is so much out of proportion to the value of the whisky, a great temptation is presented to evade the payment of the same. To guard against this, the government, by most carefully framed provisions of law and regulation, takes charge of the liquor from the time it issues from the still until it is withdrawn from its custody by the distiller or owner, upon payment of the tax. These provisions of law are most minute and occupy many sections of the Revised Statutes. Of these, it may be well to recite in full the following (U. S. Comp. St. 1901, pp. 2122, 2124):

"Sec. 3271. Every distiller shall provide, at his own expense, a warehouse, to be situated on and to constitute a part of his distillery premises, and to be used only for the storage of distilled spirits of his own manufacture until the tax thereon shall have been paid; but no dwelling house shall be used for such purpose, and no door, window, or other opening shall be made or permitted in the walls of such warehouse leading into the distillery or into any other room or building: and such warehouse, when approved by the Commissioner of Internal Revenue, on report of the Collector, is hereby declared to be a bonded warehouse of the United States, to be known as a distillery warehouse, and shall be under the direction and control of the collector of the district, and in charge of an internal revenue store-keeper, assigned thereto by the Commissioner.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Sec. 3273. The store-keeper assigned to any distillery warehouse shall also have charge of the distillery connected therewith; and every store-

keeper shall have charge of the warehouse to which he is assigned, and of such distillery, under the direction of the collector controlling the same.

"Sec. 3274. Every distillery warehouse shall be in the joint custody of the store-keeper and the proprietor thereof. It shall be kept securely locked, and shall at no time be unlocked, or opened, or remain open, unless in the presence of such store-keeper, or other person who may be designated to act for him, as provided by law; and no articles shall be received in or delivered from such warehouse except on an order or permit addressed to the store-keeper and signed by the collector having control of the warehouse."

Whenever, in the opinion of the Commissioner of Internal Revenue, such distillery warehouse is unsafe or unfit for use, he may discontinue such warehouse and require the merchandise therein to be transferred to such other warehouse as he may designate. Such transfer shall be made under the supervision of the Collector, or such officer as may be designated by the Commissioner, and the expense thereof shall be paid by the owner of the merchandise. Section 3272 (U. S. Comp. St. 1901, p. 2123). In this warehouse, spirits may remain for eight years, and they may be bottled after four years, but not before, and may be withdrawn at any time, upon the payment of the tax and charges. Act Aug. 27, 1894, c. 349, § 57, 28 Stat. 566 (U. S. Comp. St. 1901, p. 2145). As said by the learned judge (McPherson) of the court below, the warehouse is theoretically in the joint custody of the store-keeper and the proprietor, but, in fact, the control of the store-keeper is complete and practically exclusive. The lock is put on by the government and the key is in the store-keeper's possession. The warehouse must not be unlocked or opened, or remain open, except in the presence of the store-keeper, or his lawfully designated representative, and no articles may be received or taken out, except by the Collector's order, addressed to the store-keeper. Section 3274. Revenue officers may, at any hour of the day or night, enter the building to examine, gauge, measure, and take account of the spirits. Section 3276 (U. S. Comp. St. 1901, p. 2125). Immediately upon distillation, the spirits must be placed in a warehouse in casks or packages, as provided by law, and shall thereupon be gauged, proved, and marked by an internal revenue gauger, who shall cut on the cask or package containing such spirits, in a manner prescribed by the Commissioner, the quantity in wine gallons and in proof-gallons of the contents of such casks or packages. The same shall be cut on the head of such cask—

"and the gauger shall, in the presence of the store-keeper of the warehouse, place upon the head of the cask or package an engraved stamp, which shall be signed by the Collector of the district and the store-keeper and gauger."

Written upon the stamp must be the number of proof-gallons, the name of the distiller, date of receipt in the warehouse and the serial number of each cask or package. This stamp must be signed by the United States store-keeper and by the United States gauger. Section 3287 (page 2130). As a matter either of regulation or of practice, a gauger's voucher or certificate containing these particulars is delivered to the distiller. In the last of the cases at bar, the master finds that the United States gauger gave the paper certifying to the receipt, inspection, gauging and marking of the barrels of whisky in

question, and he finds in addition that there is a blank space left in this document in which may be noted withdrawals of the whisky. The same is true also as to the certificates in the first case. It was stated without contradiction in the course of the testimony, at the trial in the latter case, that without conspiracy with the gauger, these receipts could not be duplicated. There are heavy penalties for removing spirits from the warehouse, except as provided by law, and these penalties may be inflicted, although no intent to defraud may exist.

It is found as a fact in both cases, that the whisky in question was in such bonded distillery warehouses of the United States, as above described, at the time it was pledged or sold as hereinbefore stated, and under the control and custody of the officers designated by law. That such control was exclusive, is apparent from the provisions of the law as above pointed out, and it seems little less than absurd to say that the distiller was in possession of this property, when he could have been put in prison if he had attempted to take possession of it. It was property thus situated and circumstanced, that the pledgor in the one case intended to pledge and believed that he was pledging, and the vendor in the other intended to sell and believed he was selling, and the legal title to which the pledgee and vendee, respectively, had good reason to believe they had received. It is true, they relied largely upon the transfer of the so-called warehouse receipts, but attached to these receipts were the gauger's certificates, specifying by serial number and brand the particular barrels of whisky that were the subject of the sale, and nothing required by such a sale or pledge was left undone by vendee or pledgee. At common law, sales of personal property do not require to be documented, though documents, such as bills of sale and warehouse receipts, may be convenient evidence of such a sale.

We think the transactions here under consideration, between the pledgor and pledgee and the vendor and vendee are quite within the spirit and meaning of the rule as to sales of personal property, established by the decisions of the Supreme Court of Pennsylvania. No aspersion is attempted to be made of the perfect good faith obtaining in each case. To all the world, but especially to those engaged in the business of distilling and of buying and selling whisky, it was apparent that the physical custody and control of the whisky here in question was not in the distiller and vendor, but in the revenue officers of the United States, and in neither case was the distiller capable of making physical delivery to his pledgee or vendee. All those doing business with these distillers, including creditors, were bound to take notice of this notorious physical fact and were put upon due inquiry, and had imposed upon them the duty of self-protection, as to the title of the goods so situated. It was a situation created and established by a law of the United States, of which all persons, creditors as well as others, were presumed to have had knowledge.

It is true that in these cases there had been no technical bailment of the goods sold or pledged, and some confusion of mind and embarrassment at the argument seems to have resulted from the attempt

to liken the deposit of these goods in a distiller's bonded warehouse to a common-law bailment, where the bailee assumes a definite duty to the bailor, or his transferee. But the courts of Pennsylvania, as well as elsewhere, have not concerned themselves with technicalities, or allowed themselves to be embarrassed by the mere names of things. It does not matter whether this custody by the government's officials be classified as a bailment, or not. The real question is, whether the goods, at the time the sale and pledge were made, were out of the possession of the vendor and in the possession of another for a lawful purpose, recognized as such, not only by the vendor and vendee, but by all engaged in that business. The physical possession was not transferred, because it was out of the power of the vendor to transfer the same, without the payment of a tax many times the value of the goods sold, one of the very objects of the law providing for the government's custody of the whisky presumably being that the payment of the tax might be deferred for a number of years without interfering with the right to transfer the property therein.

This brings us to the not unimportant consideration, that founded upon this statute of the United States, and in promotion of its general purpose, the custom and usage, of which these records compel us to take notice, has grown up in the trade, to freely buy and sell whisky in such bonded distillery warehouses, such sales being evidenced by the delivery of these storage certificates and so-called warehouse receipts, in lieu of the physical possession which the distiller or owner is incapable of delivering without a surrender of the privileges the statute was intended to provide. In his opinion in the Taney Case (176 Fed. 606), the learned judge (McPherson) of the court below finds as a fact that the evidence leaves no doubt upon the point, that it is the unbroken custom of the trade to treat these storage certificates as completely equivalent to the spirits themselves, and to sell or pledge them freely and without question. In so far as the custom sanctions the underlying sale and purchase of whisky thus situated, and recognizes these certificates and so-called warehouse receipts as evidence thereof, the custom is reasonable and within the philosophy of the rule which dispenses with the necessity of delivery of physical possession, where the possession is not in the vendor but in a third person for a lawful purpose, and the non-delivery is consistent with the honest intent and object of the sale. So that, even if this custom of the trade of long continuance, and reasonable in itself, were in some particulars inconsistent with the general rule of law, but not conflicting with any settled public policy, it might settle the question in hand. From what we have said, it is apparent that it is not inconsistent with either public policy or public law in the state of Pennsylvania.

[3] The contention has been strenuously made, that the certificates and receipts in controversy are documents of a statutory origin, and that their force and effect involve the construction of a statute of the state of Pennsylvania. The statute referred to is the act of September 24, 1866. 1 Purd. Dig. (13th Ed.) p. 393. It provides that:

"Warehouse receipts given for goods, wares and merchandise * * * stored or deposited with any warehouseman, wharfinger or other person in this state * * * shall be negotiable and may be transferred by endorse-

ment of said receipt or bill of lading; and any person to whom said receipt or bill of lading may be so transferred shall be deemed and taken to be the owner of the goods, &c. therein specified, so as to give security and validity to any lien created on the same."

It further provides that:

"No property on which said lien may have been created shall be delivered by said warehouseman * * * except on the surrender and cancellation of said original receipt or bill of lading."

It is plain that these provisions of the statute have to do with ordinary bailments with public warehousemen or other persons receiving goods in custody from another as a matter of business, and giving receipts therefor. If this statute accomplishes anything, it is to render certain the legal character and negotiability of such warehouse receipts as it describes, and to enforce the performance of the duties undertaken by the warehousemen. The relative rights of bailor and bailee and of warehousemen in general are well established and settled by the common law. For the purposes of the transactions referred to in this statute, the bailee or warehouseman must be a third and independent person between the bailor and the purchaser or pledgee to whom the receipts are delivered. The statute does not authorize a man to become his own bailee or his own warehouseman, and the courts have frowned upon any attempt to allow him to assume that position. Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117.

In the case of Bank v. Jagode, 186 Pa. 556, 40 Atl. 1018, Chief Justice Mitchell, speaking for the Supreme Court of Pennsylvania, of the provisions of this act, said:

"But, in order to have this effect, the requisites of the statute must be complied with, and plainly the first of these is, that there must be a receipt issued from a bona fide warehouse. * * * These provisions plainly contemplate that the warehouseman shall be one engaged in the business, and also that he shall be another than the owner of the goods. A large part of the security of the holder of the receipt for the actual production of the goods when called for is the business interest and good faith of the warehouseman, and the penal consequences of any breach of duty by him. This security would be greatly diminished, if not rendered worthless, if any owner could choose to say his goods were on storage with himself and issue receipts which should pass from hand to hand for value, while the goods remained under his own control, or subject to levy by his creditors."

It is plain that the papers which accompanied the gauger's certificate, and which were delivered by the distiller to the pledgee or the vendee, were framed with a view of placing the purchaser in a situation in which he could avail himself of the provisions of this warehouse law. But, as we have just seen, the distiller could not become his own warehouseman, and we think it must be apparent from our previous discussion of the United States statutes in regard to distillery warehouses, that it was not intended to place the government, through its officers or agents, in the position of a warehouseman for the distiller. It is true, that by regulation or practice, the gauger's certificate is given to the distiller, but neither the gauger nor inspector assumes thereby the responsibility of a warehouseman. There is no voluntary act of bailment on the part of the distiller, nor contrac-

tual relation assumed by the officers designated to secure the revenue tax due the government. The relation between the distiller and the officers of the government in custody of his whisky, is sui generis. It is prescribed by law and is not contractual. But a situation is thereby created, as above described, which in our opinion brings both of the cases before us within what we think is the well-settled rule of law in Pennsylvania, permitting under certain circumstances a valid sale of personal property, as against creditors, to be made in the absence of a physical delivery of the property sold.

This court has recently, in the case of the Fourth Street National Bank v. Millbourne Mills Co., Trustee, 172 Fed. 177, 96 C. C. A. 629, 30 L. R. A. (N. S.) 552, had occasion to consider and administer the law of Pennsylvania in regard to sales of personal property without delivery of possession. In that case as in these, the question arose between the trustee of a bankrupt corporation, representing its creditors, and the claimant of certain goods in the hands of the trustee, under a pledge made by the bankrupt company more than four months prior to the bankruptcy. The learned counsel for the appellants in the cases now before us has relied upon that case as supporting the contention as to the invalidity of the pledge and sale of the whisky in question as against trustees in bankruptcy. The cases, however, are entirely different, and the facts and circumstances of the case cited will serve to illustrate and emphasize the position taken as to the cases at bar. The Millbourne Mills Company, as a security for a loan from the Fourth Street National Bank, prior to the adjudication of bankruptcy, attempted to make certain pledges to the bank of grain and flour in store at its mills. The company issued certificates after the manner of warehouse receipts, of the quantity of these commodities on hand, stating that it held them subject to its order, and indorsed the same to the bank, the property, however, remaining in the possession and under the control of the company, and there being nothing outside of the certificates to indicate the right of the certificate holders to it. The barrels of flour called for in the certificate were kept together in the company's mills, but were not segregated or marked in any other way than by occupying a certain position on the floor of one of the mills, between certain posts. No agent or servant of the bank had any custody, control or supervision of this flour, nor was there anything to indicate that it differed, as to title, in any respect from other goods of the same kind in the said mill, except as above indicated. The grain called for in the certificates was grain in certain tanks, which were constantly being filled and drawn from and refilled, as the business of the Milling Company required. It was a bald case of retention by the pledgor of the possession of goods capable of delivery, and without any reason for the non-delivery, except the convenience of the parties. By express provision of the bankruptcy act, the trustee is vested with the title of the bankrupt, as of the date of adjudication, to all property which, prior to the filing of the petition, might have been levied upon and sold under judicial process against him, and as such, the grain and flour there in question was decided to be such property. In the cases at bar, however, the whisky is so

completely in the government's actual control and possession, that it cannot be levied upon by judicial process in the hands of a sheriff. This was decided in McCullough v. Large (C. C.) 20 Fed. 309, by Mr. Justice Bradley and Judge Acheson. What we have already said as to the facts and circumstances of the cases at bar, indicate the difference of the two situations, and it is not necessary to further dwell upon them, after the clear and satisfactory discussion of the same by the learned judge (McPherson) of the court below.

As the reason for the rule making fraudulent, as against creditors, transfers of personal property, unaccompanied by actual delivery, is based upon the policy of preventing the fictitious credit permitted by allowing possession to remain in the debtor, it is pertinent to remark, in regard to a situation which, under the laws of the United States is, as we have said, sui generis, that, as the creditors of the Distilling Company had no access to the interior of the warehouse, they could not claim to have been misled to their injury. They cannot be deemed to have given credit upon the faith of whisky in a warehouse of which they had no means of ascertaining the contents.

Of course there is a possibility of fraud, if a dishonest distiller, with or without collusion with a government official, makes a second sale or second pledge of the same property. But, as said by the court below, this possibility has no bearing upon the question now under consideration. There is no dispute at present between two persons, both of whom are innocent purchasers or pledgees, the question being, whether any innocent purchaser or pledgee of a bonded warehouse receipt can get a good title to the whisky without taking actual possession. For the reasons above stated, we are of opinion that the trustees' rights to the whisky here in question are not superior to those of the appellees, as bona fide holders for value, prior to the adjudication of bankruptcy, and the decrees of the courts below in both cases are hereby affirmed.