Rudolph Lederer, Appellee, v. Railway Terminal & Warehouse Company, Appellant.

Gen. No. 33,556.

MATCHETT, J., dissenting.

Opinion filed March 17, 1930. Rehearing denied March 31, 1930.

TENNEY, HARDING, SHERMAN & ROGERS and WINSTON, STRAWN & SHAW, for appellant; ROGER SHERMAN, HENRY F. TENNEY, JOHN C. SLADE, RICHARD H. HOLLEN and THOMAS A. REYNOLDS, of counsel.

DEFREES, BUCKINGHAM, JONES & HOFFMAN, for appellee; WILFRED M. DOHERTY, of counsel.

MR. PRESIDING JUSTICE McSURELY delivered the opinion of the court.

This is an appeal by defendant from an adverse judgment for $56,234 entered upon the verdict of a jury in an action to recover damages from fire to some bonded whisky which was stored in a room in defendant's warehouse in Chicago.

The first two counts of plaintiff's declaration, as amended, were the usual counts in bailment, alleging that plaintiff had delivered cases of whisky to the bonded warehouse of defendant, for which defendant issued warehouse receipts to plaintiff, but so carelessly and negligently kept the same that a large number of cases were lost and damaged. The third and fourth counts charge specific negligence in respect to a sprinkler system, in that defendant caused the water to be shut off from the sprinklers in its warehouse, by reason of which a large number of cases of whisky were burned, destroyed and damaged by fire. The fifth count was a count in trover. As to this last count, trover can be maintained only where plaintiff can show possession or immediate right of possession at the time of the alleged conversion. The facts hereafter stated wholly negative the existence of this element.

The case was tried on the theory of an ordinary bailment and the jury was instructed accordingly. In such a case, where the goods delivered to the bailee are not returned or are returned damaged, the law presumes negligence on the part of the bailee unless he shows that the loss did not result from his negligence. *Byalos v. Matheson*, 328 Ill. 269. Considering this as an ordinary bailment case, we hold that the evidence shows that the fire which did the damage to plaintiff's whisky was not caused by any negligence of defendant.

In 1919, before National Wartime Prohibition became effective, plaintiff was the holder of distiller's certificates for a large quantity of Kentucky whisky held on deposit in bond in various distillery warehouses in that State, upon which the internal revenue tax had not been paid. In that year those certificates were turned over to a whisky salesman named Weis for the purpose of having the whisky brought to Chicago. This was done and the whisky with a considerable amount in addition was transferred to the warehouse of Wakem & McLaughlin, in Chicago. In 1923 the United States Government ordered the Wakem & McLaughlin bonded warehouse discontinued and that the whisky held therein be transferred to two other Chicago warehouses—one the building of the Sibley Warehouse & Storage Company and the other the building of defendant. The designation of these warehouses was under what is called the Concentration Act of February, 1922. In accordance with this order, 12,350 cases of plaintiff's whisky were transferred to defendant's building in 1923. This was under bond, pursuant to government permits, and under guard and control of government officers. Upon arrival of the cases at defendant's warehouse building they were deposited in the government warehouse room and placed in charge of a government storekeeper. The rate of storage was in accordance with an agreement made between plaintiff and the defendant and was paid by plaintiff monthly. Weis testified that a representative of the defendant had asked him to store all of plaintiff's whisky in defendant's warehouse, but this was not done, approximately half of it being transferred to the Sibley warehouse. Under the law the commissioner of internal revenue had the power to designate the particular warehouse to which the whisky should be transferred.

Defendant owns and operates a general warehouse building comprising six floors and a basement. It is of brick and heavy laminated mill construction and is divided into three vertical sections known as A, B and C, by heavy brick fire walls with automatic fire doors in the openings between sections. The government bonded warehouse room occupied the entire top floor of section C—a single large room 150 feet long and 91½ feet wide; alterations were made so that it should comply with government regulations for the storage of whisky. Certain openings were entirely closed up with brick and the steel doors locked on the inside, so that when the whisky was moved in there was only one entrance to this room. The windows in the outside wall had bars, as the government regulations required; steel shutters were added. A small office for the use of the government storekeeper was built in one end of the room, provided with windows about 4 feet from the floor, so as to give the storekeeper a full view of the room. The single door to the warehouse room was kept securely locked, in accordance with government regulations, with a special government padlock, and was never opened or unlocked except by the storekeeper, who had the only key. Except when the storekeeper was there, no employee nor anyone had any means of access to the room. While the storekeeper was present employees of defendant could enter with the storekeeper's permission, and it is in evidence that certain employees were permitted at times to enter. No whisky could be brought in or taken out of the room except by government authority and upon government permit.

The storekeeper was regularly on duty from 8:30 a. m. to 5:30 p. m., except Saturday afternoons and Sundays. The fire which damaged the whisky occurred on Saturday afternoon, January 31, 1925, while the storekeeper was absent and the government room

was locked and sealed. The fire was first discovered about 5 o'clock by someone outside the building, nearly four hours after the government storekeeper had left the premises after locking the door and attaching the government seal to the lock. The fire started in this government warehouse room and was confined to it except at one spot in the floor where it burned through to the lower floor but did no damage there on account of the sprinklers operating on that floor. The discoverer of the fire notified some of defendant's employees who were in the building. Among these was defendant's superintendent, Peterson, who testified that he then went as rapidly as he could to the door of the government warehouse room and found it locked; that the firemen who arrived there at virtually the same time broke the government padlock with an iron bar and opened the door. The room was in a mass of smoke. The firemen, after breaking holes in the roof and pouring in a large amount of water for several hours, extinguished the fire. The deputy collector of internal revenue was notified and arrived at the warehouse about 10 o'clock that night and immediately assigned men to guard the room both day and night. The roof was repaired the following week, the government officials remaining in charge continuously.

There is no definite evidence as to how the fire started. A Mr. Roth, an inspector for the Chicago Board of Underwriters, testified that he had inspected the room in question on December 1, 1924; that he noticed in the little office in the room a wooden box with some sawdust used as a cuspidor; that he told the government man in charge that he should not have a wooden cuspidor, as it was a fire hazard. There is no evidence that the wooden cuspidor was there when the fire occurred two months afterwards. He also testified that he next saw the premises on February 2, 1925, two days after the fire, and he gave his opinion

that the fire started in that office. The witness, however, qualified this statement by saying that he would make no definite assertion as to where the fire started; that "nobody knows"; that he based his opinion on the fact that the fire had burned through the floor of the office and that this was the only place he found where the fire burned through the floor; that the fire probably originated in that section. He testified that the fire clearly started in the government warehouse room and did not go outside of that room.

These admitted facts prove that the fire was not the result of any negligence of defendant. The fire originated in the warehouse room after the government custodian had left. It was impossible for defendant's employees to enter the room in question after the custodian had locked the door and sealed the lock. The evidence tends to indicate that the fire was caused by some carelessness of this custodian, who did not testify. There is a total absence of any evidence indicating that it was caused by any negligence on the part of defendant. Where a bailee shows that the damage was the result of no negligence on his part, he has relieved himself of the presumption that his negligence caused the damage.

Another view leading to the same result, presented in defendant's brief and which the writer of this opinion is inclined to favor, is that this is not an ordinary bailment case, for the reason that the possession of the goods is not in the defendant as bailee but is in the possession and control of the government storekeeper. *In re Miller Pure Rye Distilling Co.*, 176 Fed. 606; *Taney v. Pennsylvania Nat. Bank*, 187 Fed. 689, 232 U. S. 174. If the possession of the bailee is not actual, it does not devolve upon him to account for the loss by showing that he was free from negligence. *Lemnos Broad Silk Works, Inc. v. Spiegelberg*, 217 N. Y. S. 595; 6 C. J. 1159; *Bertig Bros. v. Norman*, 101 Ark.

75, 141 S. W. 201. However, we do not develop this latter view, as the result upon either theory of the case is the same.

Plaintiff in the third and fourth counts of his declaration asserted specific negligence of the defendant with reference to its sprinkler system.

Defendant's warehouse was equipped with water sprinklers and the room where this whisky was stored was equipped with such sprinklers placed close to the ceiling in considerable number. When there is a fire the heat will fuse the link in the sprinkler and cause it to melt, releasing a cap and letting water flow into the room. The office of these sprinklers is to extinguish or retard a conflagration which has already started. The evidence was, and it is conceded, that the sprinkler pipes in the room in question were intentionally shut off by defendant two weeks before the fire.

Plaintiff alleged that defendant in shutting off these sprinklers from the room in question caused the loss and damage of a large number of cases of whisky in said fire. Plaintiff introduced no evidence whatever tending to support this allegation. On the other hand, defendant's witnesses testified that the sprinklers were turned off from this room to prevent freezing. The president of defendant's company testified that it was a good system but that from his many years of experience in the operation of such systems it was found necessary under severe weather conditions to close off parts of the same for longer or shorter intervals to prevent freezing; that he gave instructions to turn off the sprinkler system from this room; that the sprinklers were close to the roof and if they were left turned on, were liable to freeze; that with the room in question locked and with no access possible to defendant's employees from approximately Saturday noon until the following Monday morning, it was unsafe, at the particular time of the year, to leave the sprinkler sys-

tem with "the pipes filled with water in that government room under periods of low temperature outside." This witness also testified that he kept track of the weather forecasts in order to determine whether the sprinkler system should be turned off; that the forecast for the night of Saturday, January 31, 1925, and for the following Sunday for Chicago and vicinity was "Fair; cold wave; lowest temperature tonight 15° above zero, or lower, and probably near zero Sunday night; strong northwest winds."

Another witness, the chief engineer of the Chicago Board of Underwriters, testified that he was thoroughly familiar with various types of sprinkler systems used in Chicago, and that on or about January, 1925, there was a general practice in Chicago with respect to closing off portions of sprinkler systems under certain conditions; that where such systems are exposed to freezing they are generally shut off; that if the water was left on and freezing occurred, it was usually accompanied by a bursting of the pipes or the fittings and the water flowed through the openings. Another witness who at the time was an engineer for defendant, testified that their general practice was, whenever the temperature got down to the freezing point, about 28° or 32°, to close the sprinkler system on the top floor; that the valves controlling the system in the government room were within the room and that it was closed off so that water in the pipes would not freeze. With these facts testified to by witnesses, there was nothing to submit to the jury tending to support the charge of negligence with reference to the sprinkler systems.

Furthermore, there was and could be no evidence even remotely connecting the sprinkler system with the origin or cause of the fire, nor any evidence that, even if it had been operating, it would have prevented the fire. Possibly at a certain stage of the fire already ex-

isting, the heat might have reached a point which would have melted the fuse bars and released the water and thus hindered the progress of or extinguished the fire, but the record leaves this solely to speculation and guesswork. As was said in *Peterson & Co. v. Industrial Board*, 281 Ill. 326, "liability cannot rest upon imagination, speculation or conjecture." See also *Chicago Union Traction Co. v. Hampe*, 228 Ill. 346; *Coffin v. Chicago City Ry. Co.*, 251 Ill. App. 169.

The defendant moved the court that the jury be instructed to find for the defendant, which was refused. We are of the opinion that such an instruction should have been given, as there was a total failure of proof that defendant was guilty of any act of negligence which caused or contributed to the fire or to any of the damage resulting therefrom.

The judgment will therefore be reversed with a finding of fact.

*Reversed with finding of fact.*

O'CONNOR, J., concurs.

MATCHETT, J., dissents.

We find, as an ultimate fact, that defendant was not guilty of any of the charges of negligence made in plaintiff's declaration or any count thereof.